(116 So. 182)

No. 27964.

## MILLER v. HARTFORD LIVE STOCK INS. CO., Inc.

Feb. 13, 1928. Rehearing Denied March 12, 1928.

*(Syllabus by Editorial Staff.)*

1. **Insurance** ⟷334(1)—**Method of transporting race horses lost in transit by railroad held to satisfy requirement of proper care, within insurance policies.**

Where race horses lost in transit by railroad were transported in a box car, in which they were secured in stalls constructed therein, and one of doors of car was left open about two feet for necessary ventilation, and owner traveled in car during entire trip, method being one customarily used by race horse owners and previously employed by owner without mishap, *held,* that sufficient care was used for safety of horses during transportation, within insurance policies on the animals.

2. **Insurance** ⟷665(3)—**Finding that insurer did not establish insured's false swearing that he was not accompanied while transporting his race horses by railroad held warranted under evidence.**

In action on insurance policies covering race horses lost in transit by railroad, evidence *held* to warrant finding that insurer did not establish its claim that owner was accompanied on the journey with his horses by a negro employee, and that the policies were thereby forfeited by his false swearing to the contrary.

3. **Evidence** ⟷588—**Courts are slow to impute perjury to apparently credible witness.**

Courts are slow to impute perjury to an apparently credible witness, and they prefer to accept his testimony as true, rather than the testimony of opposing witnesses, who may have erred in their recollections.

4. **Insurance** ⟷665(4)—**Evidence held not to establish that insured race horse owner destroyed or procured destruction of horses in transportation for insurance.**

In action on insurance policies for loss of race horses while in transit by railroad, evidence *held* not to establish that owner destroyed or procured destruction of the animals by pushing them out of the door of the box car as it crossed a lake, or otherwise, in order to collect the insurance.

5. **Evidence** ⟷589—**Mere improbability of plaintiff's testimony does not authorize its rejection.**

Mere fact that plaintiff's testimony is improbable does not authorize its rejection.

6. **Evidence** ⟷5(1)—**It is common knowledge that almost all things are possible, and that which appears improbable is not always untrue.**

It is a matter of common knowledge that almost all things are possible, and that which has the appearance of improbability is not always untrue.

7. **Evidence** ⟷588—**Evidence may be such as to substantiate a fact, however improbable, because its falsity would be more improbable than fact sought to be established.**

Evidence may be such as to substantiate a fact, however improbable, because its falsity would be still more improbable than the fact which it seeks to establish.

8. **Death** ⟷4—**Death may be established by circumstantial evidence.**

Death, like all other facts, may be established by circumstantial evidence, when from the nature of the case direct evidence is not accessible.

9. **Insurance** ⟷665(4)—**Circumstantial evidence held to establish that insured race horse was accidentally killed in transit.**

In action on insurance policies to recover for loss of two race horses in transit by railroad, circumstances under which one of the horses, which was not found, disappeared and was never seen nor heard of thereafter, *held* to establish that he was accidentally killed at the same time that the other horse, which was found, met her death.

St. Paul, J., dissenting.

Appeal from Civil District Court, Parish of Orleans; E. K. Skinner, Judge.

Actions by F. T. Miller against the Hartford Live Stock Insurance Company, Inc., which were consolidated and tried as one. Judgment for plaintiff, and defendant appeals. Affirmed.

Myers & Snerly, of Chicago, Ill., and Edgar M. Cahn, of New Orleans (James Todd and Wharton Plummer, both of Chicago, Ill., of counsel), for appellant.

F. A. Middleton, of New Orleans, for appellee.

ROGERS, J. The plaintiff, F. T. Miller, was the owner in 1923 of three race horses named Vittamin, Cotrompa, and Stanley. On November 26th of that year he shipped the animals from Bowie, Md., to New Orleans, La., over the Pennsylvania and Southern Railroads. At the time, he was carrying separate policies of insurance in the Hartford Live Stock Insurance Company, the defendant, insuring him against loss from death of the horses caused by disease, accidental injury, fire, lightning, or any other hazard of transportation, within the limits of the United States and Canada. Two of the animals—Cotrompa and Stanley—were lost in transit, and, upon the refusal of the defendant insurance company to pay the amount of its policies covering the loss, plaintiff instituted independent suits to enforce the contracts. In the court below, the cases were consolidated and tried as one, resulting in a judgment in each case for the plaintiff and against the defendant for the full amount of each policy, viz. $3,000 for Cotrompa and $2,500 for Stanley, with interest from judicial demand. The defendant appealed from the judgments, and for the purposes of the appeals the cases were jointly argued and submitted.

The three horses of plaintiff were shipped in a box car. The missing animals disappeared in the nighttime at some point on the Southern Railroad between Picayune, Miss., and New Orleans, La., a distance of 49 miles. Between these places is a body of water known as "Lake Pontchartrain," which is crossed by the trains of the railroad company on a wooden trestle a fraction over 6 miles in length. Plaintiff advertised the loss of the horses and offered a reward for their recovery in a New Orleans newspaper. A few days later, the mare Cotrompa was found dead on the southern shores of Lake Pontchartrain. She was not drowned, and was apparently dead before striking the water. She had bruises on the forehead, legs, and left side of the abdominal cavity. The horse Stanley has never been seen nor heard of.

The defenses of the insurance company, as set forth in its original and two supplemental and amended answers, briefly stated, are, that plaintiff violated the terms of the insurance contract (1) by failing to use ordinary care and to make proper provision for the safety of the horses while in transit; and (2) by swearing falsely in the proofs of loss that he was unaccompanied by any person on the trip, and because, further, that he conspired and connived to bring about the destruction or deaths of the animals, if they died or were destroyed, by pushing or driving them, or causing them to be pushed or driven, out of the box car. The defendant also alleged that its liability, if any, was limited to the actual cash value of the animals at the time of their loss, which it averred was $150 apiece.

[1] First. Our examination of the record satisfies us that the plaintiff was not negligent in providing for the safety of his horses during their transportation. The method used for that purpose was the one customarily used by race horse owners, and had been previously employed on many occasions, without mishap, by plaintiff himself. Three stalls were constructed in the box car by a carpenter hired by plaintiff. Two of these stalls were at the front end of the car, and consisted of an upright 2x4 placed at an equal distance from the side of the car and spiked to the floor and ceiling; running from this upright to the front end of the car, and parallel with its sides, at a height of about 3½ or 4 feet, was another 2x4, which was spiked to the upright and to the end of the car; a 2x4 was also placed across the car, about as high as a horse's chest, and spiked to the upright and to each side of the car. Cotrompa and

Stanley were placed in these stalls. with their tails towards the engine. The other stall, which was occupied by Vittamin, was in the rear end of the car and consisted of a 2x4 wooden bar placed horizontally and spiked to the sides of the car. The head of this horse was toward the engine. Each animal was further secured by means of a halter and rope attached to a "screw eye" screwed into the side of the car. In order to obtain the necessary ventilation, according to the usual custom, one of the doors of the car was left open for a distance of about 2 feet, and braced by a piece of wood, so that the starting and stopping of the train would neither open it wider nor close it. Plaintiff placed a cot and other necessary equipment in the car, and traveled with his horses during the entire trip.

[2] Second. The serious question in the case arises from defendant's claim that plaintiff's false swearing vitiated the insurance contract, and its further contention that the deaths of plaintiff's horses were brought about by the acts of plaintiff himself.

The alleged false swearing on the part of plaintiff consists in the attempt of the defendant to show that plaintiff was accompanied from Bowie to New Orleans by a negro named John Howard, generally known as "Liquor Ben," when he had sworn to the contrary. The policies require that a caretaker must be with the animals during their transportation. Plaintiff testified that he himself acted as such caretaker, which was a compliance with the terms of the policies; hence it is immaterial from that standpoint whether Liquor Ben was with him or not.

Defendant strenuously contends, however, that the question of the presence of the negro in the car is important as affecting the credibility of the plaintiff as a witness, apparently on the principle "falsus in uno, falsus in omnibus," and that it is also important as tending to support defendant's theory that, for the fraudulent purpose of collecting the insurance, plaintiff, assisted by Liquor Ben, backed the horses out of the car, and, while the head and front legs of each animal were still within the doorway, the negro struck it a blow on the head with sufficient force to kill it.

The case was tried approximately 2 years and 3 months after the loss occurred. At that time, Liquor Ben was in Mexico and his testimony was not available. The defendant, however, produced a number of witnesses, all employees of the railroad company, who testified that there was a negro in the box car with plaintiff and his horses. In commenting upon this testimony, in his written reasons for judgment, the judge of the court below declared that the identification was not sufficient to convince him that plaintiff was guilty of perjury in his statement; that some of the witnesses made incredible statements in their identification, and others were insufficient and incomplete; that the question was one of fact, and only the hearing or reading of the evidence would disclose the value of those statements.

We have carefully examined the testimony of these witnesses as it appears in the cold type of the transcript, and are not prepared to hold the trial judge, who saw and heard them on the stand, is wholly wrong in his appreciation of their evidence. In making this statement, we have in mind the well-recognized principle that sharply contested questions of fact are generally more difficult to solve satisfactorily than questions of law. We also have in mind that, without casting any doubt on the honesty of the witnesses, we are nevertheless justified in doubting the correctness of their respective recollections. More than two years elapsed between the occurrences about which they testified and the dates on which their testimony was given.

Nothing tends to obscure the memory, no matter how good it may be, as the lapse of time. This is particularly true of testimony to identify a person by his features or by his general appearance. The so-called identification of Liquor Ben as a passenger in the box car, made at Slidell and New Orleans, occurred in the middle of the night between November 30, 1923, and December 1, 1923. So far as the identification of the negro at Meridian is concerned, it may well be that the witnesses who testified to that effect mistook for Liquor Ben another negro, who plaintiff found at the station and employed to carry water for the horses. Why the conductor in charge of the train did not demand and receive a ticket for the transportation of Liquor Ben, if he was on the car, is not explained.

It is not disputed that John Howard (Liquor Ben) was in the employ of the plaintiff at the time he shipped the horses at Bowie, Md. His name was signed to the contract to accompany the horses as caretaker, because he was to go with plaintiff. Two cots and a little pack containing the negro's clothes were placed in the car. Plaintiff also purchased two tickets, one for himself and the other for Liquor Ben. According to plaintiff's story, however, which we have no reason to doubt, the negro got drunk while in Baltimore and missed the train, and plaintiff came on without him. About two weeks after he reached New Orleans, plaintiff had the railroad company redeem the unused ticket. The horses were in transit about 5 days. Shortly after the train arrived at the Press Street yards in New Orleans, Liquor Ben made his appearance at the car. He had come to New Orleans on a passenger train, arriving there a few days prior to the car in which the horses were shipped. This fact is corroborated by the evidence of a negro race track man, who testified that he saw Liquor Ben at the fair

grounds the day before the car got in, and loaned him $5, which was later repaid by plaintiff. It is also corroborated to some extent by the proprietor of the Elrod Van & Transfer Company, specializing in the business of transferring race horses, who testified that he was called over the telephone by some one, the voice being that of a negro, who told him that Miller, the plaintiff, was coming in the next morning with three horses, and to have the transfer van meet him at the yards of the Southern Railroad Company. The witness and Liquor Ben were well acquainted with each other.

[3] The plaintiff denied emphatically that Liquor Ben was in the car with him during the journey from Maryland to Louisiana. He cannot be mistaken in this, and if his story is false he is guilty of willful perjury. Courts are slow, however, to impute perjury to an apparently credible witness. They prefer to accept his testimony as true, rather than the testimony of opposing witnesses, who may have erred in their recollections.

[4] According to plaintiff, nothing unusual happened between Bowie, Md., and Picayune, Miss., except some rough switching of the car at several points along the railroad line. When the train stopped at the latter place, plaintiff left the car and secured the services of a negro to water his horses. The train left Picayune about 10 o'clock on the night of November 30, 1923. About 10:30 o'clock, after seeing the horses were in good condition and securely tied, plaintiff went to sleep on his cot. He awoke in New Orleans at about 1:10 o'clock in the morning of December 1, 1923, being aroused by some one knocking on the door of the car, and found the two horses gone, with the door open approximately 4 feet, a broken 2x4 wooden bar on the floor, and the ropes that had secured the animals broken off, only about 2 or 3 feet of each rope remaining attached to the screw eye fastened

to each side of the car. Plaintiff immediately reported the disappearance of the horses to the employees of the railroad company. Later he notified the defendant insurance company, and then advertised his loss, offering a reward for the recovery of the animals. When the mare Cotrompa was found on the shore of the lake a few days thereafter, the other end of one of the broken halters was attached to her head. Plaintiff testified that on the night in question his cot was so placed in the car that he was sleeping with his head and shoulders in the stall occupied by the horse Vittamin. He gives as the reason for his failure to awake until he arrived at New Orleans that he was physically worn out after riding five days and nights in a freight car, doing all the work caring for his three horses, except for the occasional assistance he received from men and boys along the route in watering the animals.

The evidence in the record leaves but little room to doubt that the horses disappeared while the train was moving across the lake on the wooded trestle.

Defendant insists that plaintiff's testimony must be rejected, because of its improbability, which it argues is emphasized by certain collateral facts appearing in the record. These so-called facts are the desire of plaintiff to realize on the policies; the lack of disorder in the car, except the broken 2x4 wooden bar and the broken ropes with which the horses were tied; the uncanny ability of plaintiff to sleep undisturbed throughout the tumult which must necessarily have attended the disappearance of the horses; the impossibility of the horses jumping through the open door on the east side of the car without disturbing the telegraph wires strung along the east side of the trestle, the evidence showing that no such disturbance occurred; and the death of the mare Cotrompa before she struck the waters of the lake—from all of

which defendant concludes that plaintiff and his negro employee, Liquor Ben, killed the horses as they backed them through the open door into the lake.

[5-7] Plaintiff's story is unusual, but it is not improbable. But, conceding for the sake of argument that it is improbable, it is not on that account, solely, to be rejected. It is a matter of common knowledge that almost all things are possible, and that which has the appearance of improbability is not always untrue. The most improbable things are sometimes true, and the most probable things sometimes do not happen. Evidence may be such as to substantiate a fact, however improbable, because its falsity would be still more improbable than the fact which it seeks to establish.

It is highly improbable that plaintiff should have destroyed, or procured the destruction of, his horses for pecuniary reasons, in the light of the record, which shows that shortly after he arrived in New Orleans in December, 1923, he cashed a draft for $6,000 at the Whitney National Bank. It is improbable, also, that plaintiff could have broken the wooden bar placed across the car and in front of the horses, and the ropes with which they were tied in the manner in which those articles were found when the car reached New Orleans. At the first blush, it is difficult to understand how the noise of the departing animals failed to awaken the plaintiff. Nevertheless, it is entirely possible that plaintiff, who was 58 years of age at the time, was so exhausted by the hardships and work on the trip that he was able to sleep while the occurrence was taking place. In any event, the abstract improbability that he must have been awake does not justify us in rejecting his positive testimony that he was asleep at that time. The theory of the defendant that, if the animals left voluntarily, they would have jumped out of the car, and thus disarranged the telegraph wires, is not necessarily

correct. The horses could have easily stepped or fallen out of the car without interfering in any manner with the wires. Nor does the fact that the mare Cotrompa was apparently dead when she struck the water show that she was killed while in the car. On the contrary, the bruises on her forehead, legs, and left side of the abdominal cavity indicate that she was killed by striking the railroad trestle when she stepped or fell out of the car.

To our minds, the overshadowing improbability suggested by the record is the improbability that a man who has been an owner of race horses for 36 years, as plaintiff has, and who by reason of his close association with such animals during that period of time must have an affection for them second only to the love he has for his family, could have been guilty of so foul and cruel a deed as the defendant would have this court believe was committed by the plaintiff.

[8, 9] Third. Defendant's contention that the death of the horse Stanley has not been proved cannot prevail. Death, like all other facts, may be established by circumstantial evidence, when, from the nature of the case, direct evidence is not accessible. Boyd v. New Eng. Mut. Life Ins. Co., 34 La. Ann. 848. The circumstances under which the horse disappeared, and the fact that he has never been seen nor heard of since his disappearance, compels us to the conclusion that he was accidentally killed at the time his stable companion, Cotrompa, met her death.

Fourth. The trial judge found that the value of the horses was uncertain, but that it was not below the amount claimed by plaintiff under the insurance policies. We think the weight of the evidence sustains his conclusion in that respect.

For the reasons assigned, the judgment appealed from is affirmed, at the cost of the appellant.

ST. PAUL, J., dissents.
THOMPSON, J., takes no part.