HIGGINS, Justice.
 

 This is an action by an alleged transferee of 50 shares of paid-up Homestead stock against the administrator of the succession of the transferor, his widow in community, and the Homestead Association, to be recognized as the owner of the certificate and to have it transferred in his name on the books of the association.
 

 The sole defense made only by the administrator is that the signature of the deceased to the stock certificate is a forgery.
 

 The district judge sustained the plea and dismissed plaintiff’s suit, and he has appealed.
 

 Dr. Wallace Wood, Jr., died intestate in this city on April 17, 1933. He had been married twice. By his first wife there was issue of one son, Wilmer R. Wood, the administrator of his succession. About eleven years ago he married Dr. Mabel Fontaine. Before the marriage the parties entered into an agreement in which it was stipulated that they owned certain separate property which was generally described in the document. There were no children born of the second marriage. The deceased and his wife, being both dentists, conducted a dental parlor together. He was also interested in a farm in Tangipahoa parish, where he cultivated vetiver plants, which were used in the manufacture of perfume. His son is said to have had a one-half interest in the farm, as a result of furnishing his services and knowledge, as well as a machine in connection with the cultivation of the plants, the father providing the cash.
 

 The deceased’s financial condition- had been good, but for a considerable period before Ms death his income dwindled and he complained about his debts. The inventory of his estate shows real estate valued at $12,190, furniture, fixtures, and automobiles, $840, dental office equipment, $3,929, stock, bonds, and promissory notes, $11,965 (including the certificate in question which is appraised at $3,000), or a total of $28,834.
 

 Plaintiff testified that he was a retired business man and a friend of the deceased;
 
 *963
 
 that he operated a small farm about two miles from the doctor’s place in TNangir pahoa parish; that they visited each other and often met at the post office at Hammond, La., where they conversed; that the deceased told plaintiff that he was in need of funds and proposed a sale of SO shares of Homestead stock, which had a par value of $100 per share, for $80 per share, or $4,000, with the right of redemption within six months; that plaintiff agreed, provided he was paid 6 per cent, interest; that on December 12, 1932, he came from Hammond in his automobile with $4,000 cash, which he had taken from his safe in his home; that this money was a part of the cash that he had received for certain bonds of the United and Cuyamel Fruit Companies when they were retired by the companies; that he received the money through the Hibernia Bank and kept it in his safe at home, because he had previously lost $90,000 in the Canal Bank & Trust Company at New Orleans when it was reorganized, his money having been invested in the stock of that bank; that, as a result of this experience, his confidence. in banks had been shaken and he thereafter kept his funds in his own safe at home; that upon his arrival in New Orleans he went to the home of a friend of his family, Miss Effie Mae Atkins, on Seventh street, and she accompanied him, in his automobile, to the residence of the deceased, No. 624 Audubon street, at about 8 o’clock p. m., on December 12, 1932; that they were admitted by a servant, the deceased and his wife coming down stairs a little later; that, after greeting them, the deceased handed the plaintiff the certificate covering the SO shares of stock which had been previously indorsed by the deceased and that the plaintiff paid him $4,000 in cash, which the deceased counted and placed in his pocket.
 

 Miss Atkins testified substantially to the same effect as to what transpired in the living room of the Wood’s residence on Audubon street with reference to the sale of the stock.
 

 Dr. Mabel Fontaine Wood, widow of the deceased, was called for the purpose of cross-examination, under the act of 1908 (Act No. 126 of 1908), by counsel for the plaintiff, and she stated that the doctor informed her that he was going to sell the stock to the plaintiff for $4,000, because he needed money and wanted to move his crop of vetiver; that on the night in question the plaintiff and Miss Atkins called at their home, but before they arrived the deceased had signed the certificate in her presence, in his bedroom upstairs; that the typewritten part with reference to the transfer of the stock was on the certificate before he signed it; that she blotted his signature after he signed; that she and her husband went down stairs .together where they met the plaintiff and Miss Atkins; that her husband delivered the stock certificate to the plaintiff, who handed the deceased the $4,000 cash, which he counted and placed in his pocket; and that she did
 
 *965
 
 not know what her husband did with the money thereafter, because, during the eleven years that she was married to him, he always handled his own business without any inquiries on her part.
 

 Wilmer R. Wood, administrator and sole heir, was then also placed on the stand, under the act, for cross-examination and said that, while he did not believe it was his father’s signature, he preferred to get expert advice with reference tó it, and the court continued the case for two weeks, for the purpose of allowing him to produce proof, if he elected to do so.
 

 At the appointed time the administrator presented his evidence. Miss Genevieve Favrot, the health supervisor and nurse of the Southern Bell Telephone Company, testified that Miss Atkins, age about 34, who was employed by the company, complained of being ill on December 8, 1932, suffering from la grippe, and she took the patient home; that she visited Miss Atkins’ home on the morning of December 12, 1932, between 9 o’clock a. m. and noon, and found Miss Atkins in bed, with normal temperature, and feeling better; that on December 13 she again visited the patient and found her in bed, coughing less, somewhat improved, but her temperature had gone up to 100 degrees; that on the 14th the patient was still confined to her bed, coughing improved, but body generally sore; that on the 16th she was allowed to get up; and that on the 22d she was doing very well and returned to her work on the 27th.
 

 George C. Neelis, Jr., testified that he was the paying teller for the Hammond State Bank & Trust Company, in which bank the deceased kept his checking account; that he was familiar with the deceased’s signature, having cashed many of his checks; that, if a check bearing a signature as was written on the stock certificate had been presented to him for payment, he would not have honored it; and that, in his opinion, the signature on the stock certificate was not Dr. Wood’s signature, but that was only his belief, as he was not an expert.
 

 Wilmer R. Wood testified that he was operating a vetiver farm at Ocean Springs, Miss., for his own account, but, due to his father’s failing health, he took charge of his father’s farm at Hammond, La. (of which he was one-half owner) ; that he kept in close communication and contact with his father’s affairs and was his father’s confident and advisor in business; that he received two letters from his father, telling of his ill health and financial embarrassment, and in which he complained bitterly about his losses and debts; that, while the letters were not dated, one of them was mailed in the envelope that bore the postmark “New Orleans, La., December 12, 10:00 p. m., 1932”; that he did not have the envelope for the second letter, which was also undated, but that he received it about January 13, 1933; that on November 10, 1932, he and his father visited the American Bank together and opened the bank
 
 *967
 
 box, and that he saw certain stock certificates for 175 shares in the Home Seekers Homestead Association, in different 'denominations, five insurance policies, and two sealed envelopes containing the witness’ private papers, jewelry, stocks, etc.; that, when the bank box was opened after his father’s death, it contained relatively unimportant papers, insurance policies, etc.; that the deceased and his widow had joint access to the bank box; that shortly after December 14, 1932, his father became very ill and was practically confined to his bed until his death; that he visited him regularly once a week and that his father discussed his business affairs with him; that he did not know of his father leaving the house after he had visited the bank on December 14, 1932, as shown by the bank’s record card; that his father borrowed $2,-000 on Homestead stock in October 1932, and again borrowed $500 on February 14, 1933, on Homestead stock, both loans being made by the Homestead; that his father received the Homestead dividend checks on the 31st day of December, 1932, amounting to $500; that during the period from November 1, 1932, until his demise on April 17, 1933, his father failed to pay a great many of his current bills, including a $500 grocery bill due Quiroga Bros., nursing and doctors’ fees, and that his father did not tell him anything about the alleged $4,000 cash, nor was there any record or trace of it.
 

 Dr. Louis Schulhofer, a handwriting expert from Birmingham, Ala., who had had over thirty years of practical experience in the examination of questioned documents and had testified in a great many civil and criminal cases in state, as well as federal, courts, in thirteen different states, testified that the signature to the stock certificate was a traced forgery; that the writing showed it was labored, mechanical, and conscious, which are well-recognized earmarks and indications of forgery; that the signature of the doctor to a number of checks was free and automatic as distinguished from the forged signature; that among a number of checks which the widow produced, in compliance with a writ of subpoena duces tecum issued on the motion of the administrator, the witness selected a check dated February 18, 1933, payable to the order of Wilrqer R. Wood (which he admits he cashed on the same day) and stated that in his opinion the signature on the certificate had been traced from the signature on that check; that while the prefix “Dr.” was part of the signature on the certificate and not present on the check, the two letters were also traced, but he did not know from where; that by submitting the signatures to the “sky light test,” i. e., holding the two documents against the windowpane with the signatures superimposed over each other, they practically coincided; that the slight variation between the two was the result of the conscious and labored effort of the forger in trying to trace the signature; that Dr. Osborne, handwriting expert, in his work “Questioned Documents,” states
 
 *969
 
 that Dr. Pearce, a mathematician of Har-‘ vard University, calculated that a person would have to write his name a trillion times before he could produce two signatures that would be identical; that, by enlarging the purported signature through photography and examining it with a magnifying glass and a microscope, he was of the opinion that the signature in question was a traced forgery; that the alleged signature had not been blotted, because the ink appeared at different places to have dried without being blotted; that he would persist in that statement, even though informed that reputable persons had stated that they had seen the deceased sign the document and had blotted the signature; that he was further of the opinion that the purported signature was placed on the document before the typewriting, because the letter “r” formed by the black ribbon of the typewriter was over the blue ink of a part of the capital “D” in the prefix “Dr.”
 

 The district judge invited the attorneys, Prof. L. C. Spencer, and the attaches of the court to attempt to write their signatures in such a way that one would be an exact duplication of the other, but it appears that, while there were some that were very similar, in submitting them to the “sky light test” each of the letters of the signatures did not perfectly cover one another.
 

 The district judge also examined the documents with a microscope and a magnifying glass.
 

 In rebuttal, the plaintiff placed on the stand Prof. L. C. Spencer, who has specialized in the study Of handwriting for forty years and testified in a number of civil and criminal matters in the federal and state courts throughout the South. He testified that he had enlarged the signature on the stock certificáte by photography to three times its size; that he had submitted the alleged forged signature to the “side by side and measure tests”; that by placing the alleged forged signature alongside of the admittedly genuine signature to the check a great many variations and differences were even noticeable to the naked eye and more pronounced under magnifying glass and microscope; that these variations and differences which he described in detail and at length were cogent proof .that the signature to the stock certificate was genuine and not forged; that the signature on the check was one twenty-fourth of an inch longer than the one on the certificate, by actual measurement with an instrument; that the “sky light test” in the instant case was misleading and incorrect, because of the thickness of the paper upon which the two documents were written, so that, when the two signatures were superimposed upon each other, even though a part of a letter might be formed with a curved line, it gave the effect to the vision that the two completely coincided; that by placing the two signatures side by side, it could be seen with the normal vision that the letters to the signatures, which appeared to coincide, were
 
 *971
 
 different because it was impossible for a straight line to coincide with a curved one; that the signature to the certificate appeared to be partially blotted, as the dry ink only appeared in certain areas, whereas in other areas it showed that it had been blotted; that it was very difficult to determine whether or not the typewriting had been placed over the signature, but that he was of the opinion that the typewriting was on the certificate at the time the signature was placed thereon; and that on several occasions he had seen two genuine signatures which were identical.
 

 The district judge in his written opinion shows that he was convinced that it was a forgery, because of the coincidence that the signature to the check and stock certificate were “practically identical” and that the plaintiff had failed to account in any way whatsoever for the $4,000 cash which he is said to have paid to the deceased; and that he disbelieved Miss Atkins, because he felt that it was very improbable that a sick woman would leave her bed to go on such a mission as involved here.
 

 From our study and examination of the signatures in question, which we have examined over a powerful light with which counsel were kind enough to furnish us, we must say that Prof. Spencer’s explanation that when the two signatures are placed side by side it is plain to see that a certain portion of a letter would be formed with a straight line on one signature, whereas on the other it would be formed with a curved line, that when the two signatures were superimposed upon each other they did appear to practically coincide. We believe, as Prof. Spencer pointed out, if the two signatures could be sufficiently enlarged on thin paper and then submitted to the “sky light test,” the difference in the signatures would soon be apparent. We cannot ignore the fact that by actual measurement with special instruments, the respective letters in the signatures, as well as the lengths of them differ, as pointed out and described by Prof. Spencer.
 

 The widow in her testimony simply stated that she blotted the signature; she
 
 was
 
 never asked in detail exactly how she proceeded to do so and it might well be that she touched the signature with the blotter without completely blotting it uniformly-
 

 There is a sharp conflict between the experts as to whether the typewriting was placed on the certificate before or after the signature. Even if Mrs. Wood were mistaken or in error, and it was conclusively shown that the typewriting was placed on the certificate after the signature was written on it, that circumstance alone would not be a sufficient reason to entirely disregard her testimony. This is particularly true where no motive is proven and it appears that Mrs. Wood is testifying a-gainst her own financial interest, for,' if the stock is held to belong to the succession, she would be apparently entitled to one-half thereof.
 

 From our examination of the typewritten “r” and the capital “D” of the signa
 
 *973
 
 ture, we are unable to tell which of the experts have correctly stated what happened.
 

 The fact that Miss Atkins was sick with la grippe and was in bed on the 12th and 13th of December we do not believe is sufficient reason to entirely disregard her testimony, because it is common knowledge that patients who suffer from this ailment are usually indiscreet and leave their bed prematurely. Miss Atkins may have acted very unwisely in going out while she was ill, but that indiscretion does not impeach her testimony. She has no interest in the case other than being a friend of the plaintiff’s family.
 

 It was not incumbent upon the plaintiff to trace what the deceased had done with the $4,000 cash and to account for it, nor was it necessary that the plaintiff take a receipt for that sum, because the stock certificate would answer that purpose.
 

 Mrs. Wood, when questioned as to what became of this money, stated that her husband handled his own business affairs and she was unfamiliar with his financial matters and interests, which he had always handled since their marriage. Wilmer R. Wood, decedent’s son, testified that he was his father’s confidant and advisor in business affairs and this corroborates Mrs. Wood’s testimony.
 

 As far as the letters written by the deceased in which he complained of financial embarrassment and debts, the bank record shows that he deposited in his account in the American Bank & Trust Company, between December 14, 1932, and February 13, 1933, $1,405, and that he had spent $800 cash for the removal of the vetiver crop from Hammond to Ocean Springs, Miss. It also appears that he had placed in his name $2,400 of paid-up Homestead stock having a par value of $100 per share. Counsel for the administrator explains in his brief that this was not a purchase but merely a division of a large single certificate, which he already owned, into smaller denominations. This explanation is not borne out by the record. The inventory also shows that the deceased was far from being a bankrupt or pauper at the time he wrote the letters.
 

 In the case of Miller v. Hartford Live Stock Ins. Co., 165 La. 777, 116 So. 182, 185, two race horses which were insured and were being shipped to New Orleans disappeared from the railway car en route under most incredible circumstances. In deciding the case in favor of plaintiff, we said:
 

 “ * * * Courts are slow, however, to impute perjury to an apparently credible witness. They prefer to accept his testimony as true, rather than the testimony of opposing witnesses, who may have erred in their recollections. * * *
 

 “Plaintiff’s story is unusual, but it is not improbable. But, conceding for the sake of argument that it is improbable, it is not on that account, solely, to be rejected. It is a matter of common knowledge that almost all things are possible,
 
 *975
 
 and that which has the appearance of improbability is not always untrue. The most improbable things are sometimes true, and the most probable things sometimes do not happen. Evidence may be such as to substantiate a fact, however improbable, because its falsity would be still more improbable than the fact which it seeks to establish.”
 

 The administrator did not charge any conspiracy to defraud as between the plaintiff, Miss Atkins, and the widow. Mrs. Wood, being the widow in community, would have benefited by testifying that the certificate was not delivered and the money paid, because the certificate would then have been placed in the succession and she would have received her share thereof. Counsel for the administrator seeks to offset this by saying that it might be shown that this stock certificate was the separate property of the deceased and, consequently, she would not receive any portion of it, but there is no evidence before us to substantiate that contention. The presumption is that the certificate was community property. It is not suggested that there was any domestic unhappiness between Dr. Wood and his wife. In fact, in one of the letters introduced by the administrator, apparently written during February, 1933, the father tells his son that on account of his ill health he was dependent upon his wife, who was a dentist and jointly operated a dental parlor with him. This is convincing evidence of the wife’s devotion, loyalty, and stability.
 

 In favor of the genuineness of the signature, we have the testimony of three reputable and intelligent eyewitnesses, corroborated by a handwriting expert.
 

 The evidence tending to show forgery by tracing consisted of a handwriting expert, two lay witnesses who were familiar with the deceased’s signature, and certain alleged suspicious circumstances.
 

 From a careful study of the record, we are constrained to differ with our learned brother below, even though he gave meticulous care and attention to the trial of the case, and conclude that the preponderance of the evidence is in favor of the plaintiff.
 

 For the reasons assigned, the judgment appealed from is annulled, and it is now ordered, adjudged, and decreed that there be judgment herein in favor of Alvaro Quiroga, plaintiff, and against the defendants, Wilmer R. Wood, administrator of the succession of Dr. Wallace Wood, Jr., Mrs. Mabel Fontaine Wood, widow in community of Dr. Wallace Wood, Jr., and the Homeseekers Building & Loan Association, recognizing him as the owner of certificate No. 4619 for SO shares of Home-seekers Building & Loan Association stock of a par value of $100 each, dated November 20, 1929, and standing in.the name of Dr. Wallace Wood, and that the association transfer the shares of stock from the name of Dr. Wallace Wood to the name of Alvaro Quiroga; defendant administrator to pay 'the costs of both courts.