39 So.2d 429

**COCKRELL v. PENROD DRILLING CO.**
**et. al.**

No. 38822.

Feb. 14, 1949.

HAMITER, J., dissenting in part.

Morelock & Morelock, of Haynesville, for plaintiff-applicant.

Blanchard, Goldstein, Walker & O'Quin, of Shreveport, Meadors, Shaw & Meadors, of Homer, and Ben C. Dawkins, Jr., of Shreveport, for defendants-respondents.

FOURNET, Justice.

This is an action by an employee to recover compensation (subject to a credit for 18 weekly payments) from his em-

ployer and its insurer for total and permanent disability resulting from an accident that occurred when he lifted certain heavy equipment in the course of his employment, causing a traumatic varicocele of the left spermatic cord.

In their answer the defendants admitted the plaintiff's employment but denied the occurrence of the alleged accident, contending that the varicocele from which the plaintiff suffers was not traumatic in origin but was due entirely to a congenital or systemic weakness; that such compensation as had been paid him was given in the spirit of generosity only and for the purpose of insuring that he had the benefit of every possible doubt.

There was judgment in the trial court in favor of the plaintiff as prayed for, the trial judge giving written reasons in support of such judgment wherein he concluded that from the uncontradicted testimony of the lay witnesses at the trial "the plaintiff sustained an accident while employed by the defendant and while in the discharge of his duties in connection therewith," and, after analyzing at length and discussing the testimony of the several doctors who testified as experts, both for the plaintiff and for the defendants, concluded that plaintiff's disability was total and permanent within the meaning and contemplation of the compensation law of this state.

The Court of Appeal for the Second Circuit in its opinion reviewing the case on an appeal taken by the defendants observed [33 So.2d 537]: "Because of the great weight which is properly accorded to opinions and judgments of trial Courts by appellate tribunals, we have taken great pains in giving extremely thorough consideration to the record in this case. After exhaustive study we are firm in the belief that our distinguished brother of the District Court permitted himself to be led into manifest error in his determination of this cause. It is evident from a reading of the learned Judge's opinion that he erred in basing his conclusions upon a considerable mass of the testimony of witnesses which he extricated and isolated from the substance and text of the background. Long and detailed extracts of testimony are set forth in the opinion, which, when taken by themselves, would unquestionably carry great weight in supporting the conclusion reached. But in our opinion when these testimonial extracts are relegated to the proper position in the whole fabric of the case as presented on trial they become of little importance and yield to the convincing factors which to our minds justify another and opposite conclusion." And from its appreciation of the testimony of the lay witnesses, when considered in the light of its appreciation of the medical testimony to the effect that there is no such thing as a traumatic varicocele, it concluded the plaintiff was a malingerer, faking the accident and simulating the injury in order to recover compensation. It

therefore reversed the judgment of the lower court and dismissed the plaintiff's suit. 33 So.2d 535.

We note with regret the very caustic and severe attack upon the trial judge to be found in the brief of the defendants which charges that in deciding the case he used "unjustified and unjustifiable statements of both fact and law," in a "studied effort to 'write the defendants out of court,'" characterizing his opinion as "a creature of studied bias and unfairness," and as being "a masterpiece of animus and 'excerpt-lifting.'"

In the first place, such tactics are not necessary in presenting a meritorious cause, and they should never be indulged in before any of the tribunals of this state. In the next place, a mere examination of the record demonstrates that this attack is undeserved and most unwarranted. In fact, we are impressed, after a reading of the entire record, with the fairness and consideration which the trial judge displayed in his treatment of the litigants, their counsel, and the witnesses throughout the trial; with the painstaking and detailed manner in which he treated of the facts as reflected by the evidence; and with his clear and logical analysis of this evidence in applying it to the law of the case.

It appears from the uncontradicted testimony of the lay witnesses that the plaintiff, J. H. Cockrell, who was employed by the Penrod Drilling Company at a salary of approximately $300 a month, late in the afternoon of July 11, 1946, in the performance of his duties as a rotary helper in the drilling of the Maddox No. 1 Well in the East Haynesville Field of Claiborne Parish, while throwing what is called "a three man slip" weighing between 75 and 100 pounds around the last joint of a casing being used in the operation of the oil rig, suddenly felt a hot stinging sensation run through his left side down near his groin that made him somewhat nauseated. Feeling that the symptoms were temporary and would pass off, he completed the connection and continued to work despite the advice of the driller that he report to the doctor when the driller, observing that his actions indicated something had happened, summoned him over. However, he later decided to report to the company doctor, Dr. M. J. Rivenbark, at the hospital, using the driller's car as suggested, when the organ began to pain him considerably and he observed that it was swelling. After a perfunctory examination the doctor advised him to go home and lie down with his feet elevated so that the swelling might subside somewhat and to report back the next morning for a more thorough examination, all of which the plaintiff did. Dr. Rivenbark diagnosed the case as a traumatic varicocele and continued to treat the plaintiff for such injury for several months.

In corroboration the plaintiff offered the testimony of J. D. Norris, the driller who was in charge of the operations at the rig

at the time of the accident and who was still in the employ of the drilling company at the time of the trial of this case. He stated, in substance, that upon noticing the plaintiff rubbing his side after the completion of the connection, and observing from his attitude that something was wrong, he motioned for him to come over and asked what was the matter, to which question the plaintiff replied that he didn't know but that he had a stinging in his side; that he told the plaintiff to lower his pants and observing from a casual examination that there was a red spot on the plaintiff's body just above the pubic hair, he advised him to go to the hospital but, instead, saying this sensation might go away, the plaintiff continued to work; that a short time later, though, he did leave in his (the driller's) car for the hospital.

A fellow employee by the name of H. E. Duvall, also a rotary helper on the well and who was assisting in making the connection at the time of the accident, corroborates the plaintiff's statement that immediately after the connection the plaintiff came up to where he was and said he thought he had ruptured himself and that upon pulling down his pants he (Duvall) noticed a red spot on the lower left side of plaintiff's body. He also corroborates the plaintiff's statement and that of the driller by testifying that the plaintiff immediately thereafter went over to talk to the driller.

The company doctor, Dr. Rivenbark, who testified on behalf of the plaintiff, corroborates his testimony that the plaintiff reported to him for examination and treatment at his hospital and that while he diagnosed the case as a traumatic varicocele as the result of the history given him, having exhausted every other possible cause, he did find as a fact when he examined the plaintiff that the plaintiff was suffering from a varicocele of the left spermatic cord of moderate size, and that the size of the testicle was much enlarged due to the swelling of the tissues around it.

The plaintiff's wife, Gladys Cockrell, in corroboration of her husband, testified that up until he suffered the accident in July he had never been ill and had never been in the hospital; that since that time he has been unable to stand on his feet without getting pains and becoming nervous; that he was compelled to take "rest tablets" to alleviate the pain; and that except for four days when he tried to return to his regular work under doctor's orders, he has been able to do nothing more than "piddle" around the house. Mrs. Cockrell's father, Sam Jennings, with whom the plaintiff and his family lived for about two months after the accident, testified that at times the plaintiff's testicle swelled up and had a knot.

The record further shows that the doctor, after having treated the plaintiff for a month, on August 12, 1946, wrote a letter

to the defendant insurance company advising that while there was no evidence of a hernia as the result of the plaintiff's accident, he did have a traumatic varicocele. He stated further that if it should become larger he would not advise operation "as the tendency towards hydrocele following varicocele operation is so great." He advised the company that with the aid of a light "suspensory" the plaintiff could return to work doing light work after a rest of a week or so.

Nevertheless the plaintiff did not return to work until some time in January of 1947, when he was again employed by the same drilling company but doing lighter work with the aid of a suspensory, as suggested and recommended by Dr. Rivenbark. On the fourth day of this work he quit because of the recurring pains and swelling of the injured organ and, failing to locate the company doctor at the time he left his job, he went to a local doctor who gave him a hypodermic to alleviate his suffering. The plaintiff later reported to the hospital where Dr. Rivenbark found the vein enlarged and ordered him to bed. He remained in bed for about two days and when the swelling had subsided he advised the plaintiff to go home and rest in bed for a week or ten days, but, according to the testimony of Dr. Rivenbark on the day of the trial (in April of 1947) the plaintiff's condition was such that he had advised him not to undertake any heavy work or work of a nature similar to that he had been doing in the condition in which he then was.

We think from the foregoing testimony, as did the trial judge, particularly when it is considered in connection with the medical testimony that will hereafter be discussed, that the plaintiff did suffer an injury within the meaning and contemplation of the compensation law of this state. To hold otherwise we would have to assume that these several witnesses, including the company doctor who treated the plaintiff, perjured themselves. This we cannot do for it is the accepted rule that courts will not impute perjury to apparently credible witnesses, Miller v. Hartford Live Stock Ins. Co., 165 La. 777, 116 So. 182; Fogleman v. Interurban Transportation Co., 192 La. 115, 187 So. 73, particularly in the absence of any evidence in the record to indicate that the evidence was false or unreliable. Bonanno v. Decedue, 186 La. 1041, 173 So. 756. Not only is there no countervailing evidence whatever to impute perjury to these witnesses insofar as the occurrence of the accident is concerned, but the uncontroverted evidence shows the plaintiff, who at the time of the trial was 39 years old and had been for 20 years engaged in oil field work as a "rough neck," an occupation recognized to be very hard, had never had any illness requiring a doctor's treatment except on one or two occasions when he had chills and fever. And despite the fact that he had upon numerous occa-

sions been examined by physicians when obtaining employment and had thereafter subjected himself to examination periodically for check-ups as required by his employers, he was never informed that he had a varicocele and he never experienced any of the symptoms or pain thereof prior to the time of the injury. His fellow employees testified as to his ability and willingness to work. It would, therefore, be most unreasonable to assume that the injury that occurred as stated by the plaintiff and his witnesses would have caused sudden swelling and pain, required continuous treatment for so long a period of time, and rendered him unable to return to his former job or to do any other work of a similar nature, had it been faked and simulated.

In reviewing the medical testimony, however, we find a marked conflict between the opinions given by the experts offered by the plaintiff and those offered by the defendants as to the cause of plaintiff's injury and the extent of his disability. This conflict seems to stem primarily from their disagreement as to whether a varicocele can be caused or aggravated by strain or trauma. It is, however, conceded by all of the medical experts that a large percentage of men, because of their physical constitution, are afflicted with the potentialities of varicocele, particularly on the left side, and that the condition is, *as a rule* congenital in origin or develops over a long period of time and is infrequently disabling when accompanied by swelling and pain.

In order to determine the origin and extent of plaintiff's disability the trial judge analyzed the testimony of these experts as follows:

"Dr. M. J. Rivenbark of Haynesville, La., a graduate of Tulane University Medical School, a physician and surgeon for 21 years, and a physician who usually does work for the defendant and other industrial companies such as examinations, treatments and hospitalizations, treated plaintiff in this case As he made no notation and record of plaintiff's visit on the 11th day of July, 1946, the doctor had no recollection thereof, but his record and notations begin with the return of the plaintiff to the hospital on the 12th of July, 1946. I think the discrepancy between plaintiff's testimony and the doctor's in this respect is fully explained. It is common knowledge that doctors have been over-worked in the past few years and it is no wonder that they do not recall events without a proper record and notation to that effect.

"On the doctor's examination on July 12th, he said that he diagnosed his trouble as 'varicocele'; it was varicocele veins brought on probably by strain, and that in his diagnosis he said it was 'traumatic varicocele', and that traumatic means an injury brought on as a matter of trauma, force, or injury. Plaintiff had an enlarged or swollen cord, the left spermatic cord

and that the doctor advised treatment as follows:

" 'Cessation of work and suspension of the testicle.' The doctor treated him from July 12th, 1946 to January 30th, 1947 and several times since then. (Ev. 30, 31).

"On the four days' work in January, 1947 the doctor testified that plaintiff came in and had a dose of morphine from Dr. Lannie Waller and then reported to him about 7:10 P.M. Plaintiff was hospitalized for a few days and the swelling subsided and he sent him home to rest again. The doctor was then asked this question:

" 'When will Mr. Cockrell recover from this injury and be able to do heavy work?' and he answered as follows:

" 'That depends on a good many factors. Most of these conditions occur in patients where the nervous system is not so stable, and they worry about it. Then they are usually in a weakened state physically. *Insofar as heavy work is concerned, like rough-necking, I would not advise it.* But there are lots of occupations he could follow to earn a living and still not be disabled.' (Ev. 33).

"Then the court asked the doctor this question:

" 'What do you say his condition is now with reference to rough-necking work?' and the doctor answered:

" 'Your Honor, *under* his present condition roughnecking would not be satisfac-

tory because he lets the little discomfort and swelling he has there worry him. That would still have to be tested out further, as to whether he would carry out suggestions by keeping the scrotum suspended at the time of work, as to just how he actually improves on the job.' (Ev. 36).

"Then, defendant's counsel asked this question:

" 'If he wore the proper type of suspensory to support himself, Doctor, you think he could go ahead and do the same type work?'
and the doctor answered:

" 'Well, it is possible. Of course, some of these patients still have pain even after operation. Still have pain.' Ev. 36, 37.

"Another significant portion of Dr. Rivenbark's testimony is found on page 41 of the Evidence in this series of questions and answers:

" 'Q. Take a man who was perfectly normal, whose veins were perfectly normal, not weakened in any respect, congenital or otherwise, could he bring about varicocele by straining himself? A. Yes, he could do it by straining.

" 'Q. Before he was ruptured? A. Before he was ruptured?'

" 'Q. Before he was ruptured and caused hernia he could get varicocele? A. Yes, if he has a tight ring, inguinal ring, then clamping down on that ring will make very acute pressure on the ring.

" 'Q. Did you examine his ring? A. Yes, he has a small ring on that side.'

"Therefore, by this testimony the doctor explains that the injury could have happened and occurred in the manner in which plaintiff and his witnesses testified that it happened—that is, that it occurred as a result of the strain, lifting and throwing the slips weighing approximately 100 pounds.

"Counsel read to the doctor excerpts from medical books one of which was entitled 'Principles and Practice of Urology', copyrighted in 1935 or 12 years ago, and on page 45 of the Evidence this statement:

" 'Trauma probably has no causative influence,' speaking of varicoceles, to which he had been previously asked if he agreed with those statements and the doctor answered:

" 'That is a statement with reference to which you can get various opinions from different urologists. *Just like the old argument about hernias. They usually did not think they were traumatic.'*

"The doctor was further asked if his examination included causes that might have contributed to varicocele, such as tumors in the kidneys, hemorrhoids and things of that kind and he answered that it did and that he found no evidence of those, Ev. 47, and that it was not due to any inflammatory condition of the urethral tract. Ev. 48. On page 49 of the Evidence he was asked about the size of the left testicle when he first examined him and he answered as follows:

" 'Of course, there was no way I could tell because when I first saw him *everything was swollen.* When the swelling subsided naturally I noticed it was smaller.'

"As to plaintiff suffering pain, the doctor said:

" 'Well, it was just fairly acute pain. It was not cutting pain. It was just aching and throbbing. However, in January, his pain was very acute then and we gave him a hypo of morphine to relieve it. Up to that time no narcotics were used.' Ev. 50.

"Dr. Campbell of Homer testified on behalf of the plaintiff and testified that he examined him the morning he testified and found plaintiff with a varicocele, a little enlarged, especially higher up towards the inguinal canal. Ev. 67. This corroborates or substantiates Dr. Rivenbark's testimony to the effect that a pressure from the ring would cause this condition and who testified that the ring was small, and he further said that plaintiff's condition could be painful. Ev 68. Dr. Campbell also said that varicoceles could be caused by trauma but more often occur naturally, and that if this varicocele caused plaintiff pain he would advise that he not work. Ev. 69. And that as a rule varicocele did not disable a normal person but it could do it. Ev. 70. And as to this the doctor was

asked if it would not be the pain and not the varicocele, and he said:

" 'Well, I would say it was varicocele that caused it because you can have pain from varicocele, all right. Especially where there is a suspensory worn and maybe you have pressure from the ring, where it maybe becomes congested. That could happen.' Ev. 70, 71.

"And as to the enlargement, or varicocele, higher up, the doctor testified that likely there would be more pain because those things getting larger higher up might cause the ring to clamp down on them a little harder and cause more pain. Ev. 73, 74.

"Dr. L. G. Fincher, of El Dorado, Arkansas, in testifying for the defense testified that about ⅓ of all men have varicoceles, and as to plaintiff he says that he found no evidence of hernia, but that plaintiff had a very strong ring and possibly a little smaller than average normally. Ev. 78.

"Thus, the fact that the ring is smaller and very strong corroborates the statements of Dr. Rivenbark and Dr. Campbell that the ring could and was in position due to a strain clamp down on the spermatic vein and cause the varicocele which likelihood is borne out by the enlargement higher up next to the ring itself.

"The doctor further testified that in his opinion a varicocele could not be caused by trauma of any kind and that the plaintiff is fully able for doing oil field work. And, too, that when he examined him several years ago, plaintiff had a varicocele then. However, if that be true that he had a varicocele previous to his accident and the accident aggravated the condition, plaintiff's case would still be compensable under the law and the decisions of the courts of this State.

"But, the doctor somewhat qualifies his statement in his testimony on page 83 of the Evidence when asked his opinion as to whether or not plaintiff could have sustained a traumatic hernia so as to dissable him from performing his work, by saying:

" 'I could not render an opinion on that. If I could have seen him right then I could have told you definitely. It is my opinion that that is rather rare. I haven't ever seen one. I have never seen one. I wouldn't say that it just positively could not be done but I have never seen one that was caused by a single injury.'

"Then, the doctor says: 'He has no disability, whatever.' But, if there is an acute varicocele, that is, one that would come on instantly with swelling, the doctor says that it would take about four weeks for him to recover to return to work. Ev. 86. So, therefore, this doctor agrees that varicoceles in some form are disabling as he points out this one.

"Dr. T. J. Smith called to testify on behalf of the defendants is of the opinion that a varicocele is not traumatic. Ev. 89. He thinks the condition is congenital but

that it could be aggravated by standing on the feet a long time such as a motorman on a street car and when asked about his ability to do oil field work with a varicocele, he stated he could not definitely state that he would not have pain. Ev. 90. If a person had an acute varicocele, he says it would be his opinion that the person had suffered a direct blow to the veins. Ev. 91, 92.

"He is further of the opinion that an account of the difference in the size of the testicles that the varicocele may be of long standing. Ev. 92, 93. And, he states that if he examined a man exactly in Mr. Cockrell's condition, before he would pass him as fit for work for a company, he would want proof of the absence of pain and suffering. Ev. 94. In other words, if Mr. Cockrell suffers pain he indicates that he too would not approve him for work. Remembering Dr. Rivenbark's testimony that in January, 1947 he was suffering pain acutely that he had to give him a hypo of morphine to ease him, the conclusion is that this doctor is also of the opinion plaintiff is unable to work. The doctor thinks varicoceles are not traumatic and that plaintiff's case is no exception. Ev. 97. But, as to lifting, or straining, in cases of hernias, while he is of the opinion there would have to be a natural weakness in the area yet the lifting, that is, the straining, might be the straw that broke the camel's back, and, therefore, might be the cause of the hernia indirectly, Ev. 97, which is diffi-cult in my opinion to distinguish from directly causing the hernia. The doctor says that varicocele may or may not be disabling depending upon the degree, and that it could cause nervousness. Ev. 99.

"Dr. J. R. Stamper, a urologist of Shreveport, was called to testify on behalf of the defendants. This witness went into details as to the anatomy of the body in the area complained of by plaintiff and he says that an acute varicocele might be caused by something in the abdomen that would compress the return of the venous blood. Ev. 104. Any tissue that is full of venous blood is going to begin feeling hot and full due to the fact it needs fresh arterial blood. He says that ¼ of all men have varicoceles and that men of that type could do a day's work in the old field 'unless he had complications.' Ev. 105. The doctor is of the opinion that as a rule varicoceles are not caused by trauma, he could not think of any condition of trauma that could cause the condition, but that the condition developed over a long period of time. He testified too that at first men with varicoceles were not accepted in the army but were later accepted as the war went on. Ev. 109. He admitted, however, that varicocele makes a man nervous and gets him in condition that he cannot stand, or tolerate, pain very well and that pain he does have is exaggerated. Ev. 115. Dr. Hilton as well as Dr. Stamper was of the opinion that the plaintiff was able to go back to work and that it was the accepted

medical opinion that varicocele was not traumatic. Dr. Stamper and Dr. Hilton were also of the opinion that sexual excitement, constipation and nervousness would cause pain to a person with varicocele. Ev. 121."

Here the judge noted that the testimony of Dr. W. S. Harmon had not been filed in the record but that it had been stated by counsel that his testimony would be in line with the testimony of the other experts presented by the defendants. (This testimony is now in the record and is substantially in accord with this other medical testimony of the defendants. Dr. Harmon stated he did not believe varicoceles were traumatic in origin, most of them being congenital and developing over a long period of time; that as a rule varicoceles do not cause pain in any marked degree; that the only cure is an operation. Neither does Dr. Harmon believe that a hernia is traumatic). Continuing the trial judge says:

"After a careful consideration of the evidence in this case, I am of the opinion that it has been established by legal and competent and convincing evidence that plaintiff sustained an injury on July 11th, 1946, while performing labor and discharging his duties of his employment with the Penrod Drilling Company, as a rough-neck; that plaintiff immediately went to Dr. Rivenbark at the Haynesville Hospital for examination and treatment on that afternoon, and that he returned as per the doctor's instructions on the following morning where a more thorough examination was made; and that plaintiff remained under the care and treatment of Dr. Rivenbark continually from that time to at least January 30th, 1947, and who treated him on several subsequent occasions. The evidence also shows that plaintiff endeavored to work during January, 1947, as per the doctor's instructions, that he did work four days, and became unable to work any further and returned to the hospital where Dr. Rivenbark hospitalized him for some three or four days.

"Whatever the injury, I am convinced that plaintiff is totally and permanently incapacitated from performing any work of a reasonable character and especially his usual and regular work as a rough-neck and the only work he had experience or training in and knew how to perform. The fact that plaintiff endeavored to work under the doctor's orders and failed and then the doctor had to hospitalize him on account thereof is rather convincing evidence that plaintiff was unable to work and this is especially true since his effort to work was more than seven (7) months following the date of the accident.

"Dr. Rivenbark is an examiner and physician and surgeon for the defendant and other industrial and insurance corporations; he was not plaintiff's regular physician or that of his family—it does not appear that plaintiff himself had needed the services of the doctor's profession for

many years previously. I think Dr. Rivenbark was especially in position to know and observe plaintiff and his injuries as he says he treated him some 25 to 30 times at least, more so than any other physician who obtained their knowledge and information relative to his injuries from mere examinations. Dr. Rivenbark's testimony was extremely fair, unbiased and unprejudiced as would appear from the whole thereof and the court was impressed with the honesty and sincerity thereof. The other physicians and experts in the case, of course, did not have the opportunity in merely making superficial examinations to learn about plaintiff's condition as much as Dr. Rivenbark, and by the former statement no reflection is intended toward the other experts whose knowledge of plaintiff and his condition the court recognizes as somewhat limited as they did not have the opportunity to treat, see, examine and observe plaintiff as Dr. Rivenbark did."

From the foregoing it will be seen that the trial judge's analysis of the medical testimony was most thorough and studied, reflecting his aptitude in the proper application of the well-recognized rule that wherever witnesses differ the court should reconcile the apparent contradictions their testimony presents, if possible, and that, if this cannot be done, then consider the probabilities or improbabilities of their respective statements in the light of their capacity, opportunity or incentive for observation, the amount of corroboration, if any, and the degree of proof required. Fridge v. Talbert, 180 La. 937, 158 So. 209.

The Court of Appeal, without analyzing the medical testimony, concluded that according to the vastly preponderating weight of the medical testimony "there is no such thing as a traumatic varicocele" [33 So.2d 538], and from this premise apparently deduced the further conclusion that the plaintiff had faked the accident and simulated the injury.

Many of the deductions and conclusions of the Court of Appeal, in our opinion, were neither sound nor logical, not being in accord with the rules applied generally in analyzing testimony in an effort to determine the sufficiency and weight to be given it, and, in some instances, these conclusions are not supported by the record. To illustrate: We find the following statement in the opinion of the Court of Appeal: "We observe with some amazement the effort which the able Judge of the District Court has made in his written opinion to justify the conclusion that plaintiff went to Dr. Rivenbark immediately after the 'accident.' In doing this he has been forced to write out of consideration the positive testimony of Dr. Rivenbark himself which was based upon his office records."

On this point the plaintiff stated that shortly after the accident he decided to follow the advice of the driller and report to the doctor when he noticed his condition and experienced the attendant pain,

leaving as soon as he could change his clothes and using the driller's car for that purpose. Dr. Rivenbark did not positively deny the plaintiff visited him on the 11th. His testimony is, rather, that "according to the [his] record it was the 12th." (Brackets ours.)

There is certainly nothing about the plaintiff's testimony that renders it incredible or unworthy of belief and there is, consequently, no reason to impute perjury to him, particularly when we find that Dr. Rivenbark was testifying exclusively from his records as made up and could not remember anything about other matters that were not reflected on these records, as, for example, whether he had ever been paid for the services he rendered the plaintiff.

We think it is more reasonable to assume, as did the trial judge, that because of a press of business the doctor failed to note this late visit of the plaintiff to his office on July 11, at which time he made a superficial examination only, than it is to impute perjury to the plaintiff, especially since so many of the surrounding circumstances tend to corroborate the plaintiff.

We are further fortified in this conclusion from our examination of the testimony given by the medical experts of the defendant. They, too, in giving their version relied on their records and, in some instances, stated they were not sure of certain facts or incidents because these had not been noted on the records from which they were then testifying.

Because of the conclusion we have reached here, the cases relied on by the defendants, Perkins v. White Grandin Lumber Co., 17 La.App. 47, 135 So. 275; Norris v. Crowell & Spencer Lumber Co., La.App., 157 So. 164; Cunningham v. Louisiana Central Lumber Co., La.App., 8 So.2d 115, are not controlling. An examination of these cases will show that each was decided on the particular evidence before the Court.

The defendants, relying on the case of McClung v. Delta Shipbuilding Co., La. App., 33 So.2d 438, on rehearing at 34 So. 2d 70, have filed in this court a motion to remand the case, which motion is based upon the allegation that they have only recently discovered the plaintiff has, since July of 1948, been employed by the Gen eral Geophysical Company of Houston, Texas, as a driller, and the further allegation that they believe he was, prior to that time, employed by other companies in Texas, Louisiana, and Arkansas to do heavy oil field work, probably dating back to the decision of the Court of Appeal denying his claims in November of 1947, all of which facts they expect to be able to establish as the result of a further investigation now being conducted by them.

In opposing this motion the plaintiff contends defendants' remedy under Section 20 of the Act No. 20 of 1914, as amended by Acts No. 38 of 1918 and No. 85 of 1926, is for the employer to apply to the trial court for a modification of its judgment if the facts so warrant, citing the

case of Mickley v. T. J. Moss Tie Co., La. App., 189 So. 331.

In the McClung case the Court of Appeal concluded the interest of justice required the case be remanded on the motion of the defendants, to which was attached 16 enlarged prints lifted from a motion picture film taken some two months after the trial of the case showing the plaintiff doing work that he could not possibly have performed had he been totally permanently disabled, which evidence would impeach his testimony as to his condition at the time of the trial.

While the defendants claim the evidence they hope to introduce if the case is remanded will "definitely show that the disability, which the plaintiff claims, does not exist, *all in accordance with the vast preponderance of the medical and lay testimony already in the record,*" such evidence, in the face of the conclusion we have reached here, would merely tend to show the plaintiff is presently employed as a driller and has been doing oil field work since his case was rejected by the Court of Appeal, only indicating that his condition is improved and would probably warrant the conclusion he has recovered sufficiently to do the type of work he was engaged in doing at the time of the accident. We do not think it would justify the conclusion that he was never actually disabled, having faked the accident and simulated the injury.

It is our opinion, however, that the ends of justice require that we remand

the case to allow the defendants an opportunity to show the extent of the plaintiff's recovery and his condition from November, 1947, as the remedy accorded them under Section 20 of the act would be inadequate since if the plaintiff is able to and has been doing work of a nature similar to that in which he was formerly engaged he would have a judgment for compensation for a period extending beyond November, 1947, to which he is not entitled.

For the reasons assigned, the judgment of the Court of Appeal for the Second Circuit is annulled and set aside and the case is remanded to the lower court in order that evidence may be introduced for the purpose of showing the extent of the plaintiff's disability from and after November, 1947.

O'NIELL, C. J., and HAWTHORNE, J., take no part.

HAMITER, Justice (concurring in part and dissenting in part).

This case should be remanded, I agree, for the introduction of further evidence. That to be received, however, should not be limited to a showing of the extent of plaintiff's disability from and after November, 1947. In view of the irreconcilable conflict contained in the transcript of testimony before us there should be introduced also on the remand additional evidence relating to the alleged accident and injury and any resulting disability.