FOURNET, Chief Justice
(dissenting).
I have no quarrel with the author of the majority opinion in his feeling that a wife is as entitled to her personal recreations and enjoyments as to her food and clothes, but in permitting this sentiment to control the decision in this case he overlooks the basic law of this state and the jurisprudence thereunder which is to the effect that a wife cannot bind the community and hold the husband as head and master thereof for even the necessaries of life unless the husband has failed or refused to supply them for her. It is admitted in the majority opinion that our law in this respect was correctly stated in the opinion of this court in Adams v. Golson, 187 La. 363, 174 So. 876.
In that case we pointed out that there can be no liability in this state for damages sounding in tort except in those instances that are specifically provided for in the Revised Civil Code and in our statutes and that since a wife under our system of marital relations is without authority to contract a debt that will bind the community, even though that debt be for the necessities of life, except under the conditions just mentioned, a husband could never be held liable as head and master of the community for the tortious acts of his wife unless it was affirmatively shown that at the time these acts were committed she was, with the express or implied consent of her husband, attending to the business or affairs of the community. Since the facts of that case clearly established that the wife became involved in the accident while on a pleasure trip to Baton Rouge to attend a style show and fraternal meeting, the court concluded the community was not liable.
The Adams case, written some 13 years ago, was decided by a unanimous court in accordance with the law and jurisprudence with respect to the wife’s right to bind *439 the community for debts contracted in the furtherance of her personal pleasure as its then component members understood it. It therefore seems to me that any change in this law lies within the exclusive province of the legislature. However, even though the majority of the court has concluded to undertake the province of enlarging the husband’s liability for the debts and torts of 'his wife without legislative action, I believe the court has erred in concurring with the conclusion of the Court of Appeal for the Second Circuit with respect to the proximate cause of the accident and the law applicable thereto.
My appreciation of the facts of this case, after a careful study and analysis of the record, leads to the inescapable conclusion that the plaintiff’s own negligent and careless operation of his car was the sole and proximate cause of the accident. However, giving his version of the accident, . and his evidence introduced in support thereof, its most favorable interpretation there can be no doubt that he was guilty of contributory negligence, and, consequently, is barred from any recovery.
I find the undisputed facts disclosed by the record to be that the accident occurred on Highway No. 80 about 5:45 p. m. on July 25, 1947, not far from Dunn, Louisiana, and at a point where the lane leading into the Clarkson home from the highway intersected it. The Clarkson car, the Brantley car, and the car of Purvis (one of plaintiff’s most important witnesses) were all proceeding on the south lane of this highway in an easterly direction, and in that order. Mrs. Clarkson had negotiated a safe left turn across the north lane and had entered the roadway leading to her home when she observed that one of the two cars that had been following her swerved to the right, then to the left, and came to rest some distance away in an overturned position, with the result that it was seriously damaged.
In order to properly appraise and give correct credence to the weight of the testimony in this case the allegations of the plaintiff’s pleadings and of the defendants’' answer must be set out rather fully before an analysis of the evidence introduced by both parties in support thereof is approached.
In his petition the plaintiff alleges that just immediately prior to the accident, and while he was driving carefully at a moderate rate of speed on his side of the highway, he observed the 'Clarkson car ahead and gave timely notice of his intention to' pass it by sounding his horn; that he then proceeded to cross the black line to the north half of the highway, again giving notice of his intention to pass by sounding his horn, but that Mrs. Clarkson, without any warning of such intention, suddenly attempted to make a left turn and becoming excited, stopped the car, thus blocking the highway immediately in front of him. He further alleges that he thereupon applied his brakes to avoid striking Mrs. Clark- *441 son and. in turning his car to the right, ran completely off the pavement to . the south shoulder of the highway; that finding he was then headed for a deep ditch in which there was a post he was forced to make a sharp turn back to the left; “that the sudden application of. his brakes, the sharp turn to the right to avoid striking the Clarkson car, then the sharp turn to the left to regain the pavement caused petitioner’s car to swerve and turn perpendicular to the Highway with the right side facing east; that the car made a complete roll in the middle of the pavement, starting on the right side, making a complete turn and ending on its right side.” (Italics mine.)
While denying that the plaintiff sounded his horn or gave any other signal of his intention to pass, Mrs. Clarkson’s version of the accident, according to the allegations in her answer, is that she negotiated a left turn with complete safety and was in the lane leading to her home when she heard the skidding of the car and its overturn. Her allegations are that she was traveling along the south side of the highway in a slow and prudent manner and that just before she made the turn into her lane she saw by looking in her rear view mirror, that two cars were approaching from the rear but that they were in excess of 300 feet behind her; that she gave a signal that she was turning left by extending her left hand and arm out of the automobile and drove to the left across the north side of the highway without stopping or driving in front of the plaintiff’s car; that it was after she had driven up this lane a short distance that she heard the grinding of the brakes and the noise of the automobile skidding and turning over, at which time she looked back and saw “the plaintiff’s automobile engaged in a series of reckless, dangerous and highly complicated man-oeuvres across and upon the paved highway, first from one side of the road and then to the other,” coming to rest finally on the highway completely turned over.
To sustain his version of the accident the plaintiff in his own testimony stated that, returning home from his job as an oil field worker, he was traveling along the highway at a rate of SS miles an hour; that when he was about 300 feet to the rear of the Clarkson car he sounded his horn to indicate his intention to pass and again sounded the horn when he was approximately 150 feet to the rear; that he then proceeded to cross the black line and when he was about half over this line and some 25 or 30 feet to the rear of the Clark-son automobile he sounded his horn a third time “to be sure she heard” him. He says that after he had crossed the black line and was preparing to pass the Clarkson car Mrs. Clarkson made a short turn, without giving any signal, and stopped her car across his path in the road. At this time he was so close to her he “could see that she was over the black line on the left of the road.” Therefore, in order to avoid *443 striking her car he “hit” his brakes (explaining by this he meant he just touched them with his foot “otherwise I would have skidded and slipped into her”), pulled sharply to the right, swerving again to the left when he observed he was headed for a deep ditch and post,' and turned over on the highway some 50 or 75 feet from the point where he passed the Clarkson car. He says Mrs. Clarkson came over to see if she could render any assistance, at which time, in the presence of Purvis she said she was returning from “getting her laundry.”
In an effort to corroborate his version of the accident Brantley offered the testimony of his fellow-worker, Pete Purvis, who was his principal witness. Purvis states he was following some 250 yards (not 250 feet as the Court of Appeal states in its opinion) behind Brantley’s car and, .traveling at approximately 60 miles an hour, was overtaking him. He observed Brantley pull to the left to pass the Clark-son car and saw the Clarkson car turn to the left and stop “approximately middle ways of the black line.” He says Brantley then some 6 to 8 feet to the rear of the Clarkson car, turned quickly to the right, swerved again to the left, and skidded and turned over on the opposite side of the highway. He viewed the premises which showed the Brantley car had gone some 20 or 30 inches onto the shoulder of the road at a spot just exactly opposite the driveway to the Clarkson home, as evidenced by skid marks made there. (In this respect he is. corroborated by the state highway policeman who viewed the scene and interrogated-the witnesses soon after the accident.) He corroborates Brantley’s testimony with, respect to what Mrs. Clarkson told them had been the nature of her missions, i. e.,. that she had been to get her laundry. However, he .failed to support the plaintiff’s, testimony on a most important point, that, is, that Brantley signaled his -intention to-pass the Clarkson car by sounding his horn on three different occasions. His testimony in this respect corroborates that of-Mrs. Clarkson, who said she had heard, no horn blown.
Mrs. Clarkson testified substantially asset out in 'her answer, both when she was called to the witness-stand on cross-examination under the rule and when she was a witness in ‘her own behalf. She states-she had been to the home of a friend to. borrow some knitting needles and, finding-no one at home, was returning to her house; that she was traveling about 20' miles an hour and when about 15 feet from the entrance to the roadway leading to her home reduced her speed to 10 miles, looked in 'her rear mirror -and seeing two cars, approaching from that direction, the first, about 300 feet behind, gave a signal that she intended to turn to the left; that she successfully negotiated the turn without, stopping, as stated by Brantley and Purvis; that upon hearing the noise of the brakes and the overturning of the car she stopped. *445 her car in the lane leading to her home and returned to the scene of the accident, the car then lying overturned some 150 or 200 feet from her driveway.
The Court of Appeal in analyzing this testimony failed to take into consideration the well-recognized rule of law that “where-ever witnesses differ, the court should reconcile the apparent contradictions their testimony presents, if possible, and, if such cannot be done, then consider probabilities or improbabilities of their respective statements, in the light of their capacity, opportunity, or incentive for observation, amount of corroboration, if any, and degree of proof required.” Cockrell v. Penrod Drilling Co., 214 La. 951, 39 So.2d 429.
Clearly from the foregoing it will be seen that the plaintiff is not corroborated by his witness Purvis in many of the material aspects of the case. Purvis not only testified he did not hear any of the three signals the plaintiff said he gave of his intention to pass Mrs. Clarkson by the sounding of his horn, but he also fails to corroborate the plaintiff’s testimony that Mrs. Clarkson made a sudden turn without giving any signal for while he did testify on direct examination that Mrs. Clarkson h'ad not given a signal of her intention to turn to the left, on cross-examination, when asked whether he could definitely state Mrs. Clarkson had not held out her hand to signal her intention to turn left, he replied: “There is a possibility she could have held out her hand but I did not see any hand signal.” He corroborates Mrs. Clarkson’s statement with respect to the skid marks on the shoulder of the highway just exactly opposite the Clarkson driveway, and, as a necessary corollary, her version of the accident, as will be hereinafter demonstrated.
In addition to these weaknesses in the plaintiff’s case, it is to be observed that the Court of Appeal did not believe the plaintiff’s story, in which he was corroborated by Purvis, that Mrs. Clarkson told him she was returning from getting her laundry. Furthermore, aside from these instances in which the plaintiff’s testimony is impeached or contradicted, I find that there is no corroboration for his statement that his car, when it overturned, was only 50 or 75 feet from the Clarkson driveway. Mrs. Clarkson’s statement, on the other hand, that the car was some 150 or 200 feet from her driveway, is overwhelmingly established by the testimony of other witnesses.
It is obvious, therefore, that the preponderance of the evidence is clearly in favor of Mrs. Clarkson’s contention that the sole and proximate cause of the accident was the plaintiff’s attempt to pass the Clarkson car without giving any signal and while traveling at a rapid rate of speed.
If there could be any doubt in this respect, however, I think the physical facts in this case conclusively show the testimony of the plaintiff and of his principal witness is incredible, and, in fact, supports Mrs. *447 Clarkson’s version of the accident. Simple mathematics will show that the Brantley •car, traveling at the rate of 55 miles an hour, was covering approximately 80 feet a second and could not possibly have avoided striking the Clarkson car if, as testified, this car stopped directly in front of the plaintiff in the middle of the highway when he was only 25 or 30 feet to the rear (and still more so if he was only the 6 or 8 feet to the rear Purvis, in contradiction of Brantley, says). On the other hand, the •Clarkson car, which Mrs. Clarkson testifies she slowed to 10 miles an hour when she was 15 feet from the driveway, was covering approximately 9 feet a second. This means that it would take her a little over 3 seconds to negotiate the turn across the south lane of the highway and the additional 18 feet across the north lane. During this crucial time the plaintiff, admittedly traveling 55 miles an hour and therefore covering 80 feet a second, would have arrived at the approximate point from which Mrs. Clarkson began her turn. This unquestionably corroborates Mrs. 'Clarkson’s testimony and the fact that she negotiated the turn without being struck. It is even more incredible that Brantley, at this rate of speed and in such close quarters, could have gone only 20 or 30 inches off the pavement at a spot exactly opposite the Clark-son driveway, when he swerved to the right to avoid striking Mrs. Clarkson.
From my appreciation of the evidence, the conclusion is inescapable that the plaintiff, who was traveling at a rapid rate of speed, saw the Clarkson car, as he testified, some several hundred feet ahead and at the time Mrs. Clarkson was preparing, as she had signaled, to make a left turn. Because of the distance between them, he believed the turn would be negotiated successfully before he reached the crucial point but, suddenly realizing the Clarkson car would not quite clear his path, he found it necessary to make a quick swerve to the right that carried him off the pavement some 20 or 30 inches. It was in his effort to get back on the pavement at the 55-mile-an-hour pace he was traveling, and which he admittedly did not appreciably reduce, that he lost control of the car and overturned.
For these reasons I respectfully dissent.