ELLIS, Judge.
This is a compensation suit in which the plaintiff appeals from an adverse judgment in favor of his employer. The District Court held that the plaintiff had not borne his burden of proving the occurrence of an accident.
The accident was alleged to have occurred at about 6:00 P.M. on March 26, 1955, midway in plaintiff Fee’s workshi-ft of 2:00 to 10:00 P.M. Fee testified that while loading defendant’s heavy paper rolls in a railway car that his foot slipped and he twisted his back, causing an immediate severe pain in his lower back, radiating into his right leg.
Fee testified that he thought the accident would not be serious and did not discuss it at work nor report it. After Fee got home, the pain increased to such an extent that he was unable to sleep and took some medications, and the following morning at 8:00 A.M. he went to defendant’s company doctor, Dr. C. L. Saint.
Dr. Saint found Fee disabled by a lumbo-sacral strain which he termed “minimal” but which an orthopedic specialist to whom he referred Fee eight days later termed “acute,” although subsiding.
We may state, as we shall discuss in detail later, that the vast preponderance of the medical testimony indicates conclusively that Fee has been continuously disabled from working since 8:00 A.M. on the Sunday morning, which was approximately fourteen hours after the alleged accident, and about ten hours after Fee left his night shift on defendant’s premises.
Fee had been employed by defendant and had performed his heavy duties for two years prior to the accident in question. Before employment by defendant, he had passed a pre-employment physical examination which the company physician indicated was very strict as to the back.
Prior to that, according to the uncontra-dicted testimony of Fee and his wife, he had been continuously employed at hard labor during the 19 years of his marriage, except for two intervals, totalling 10 months in all, on welfare assistance for a stomach disorder, which the evidence indicated was approximately during World War II.
The conclusion is inescapable that this working man must have sustained some traumatic back injury, either during his workshift of 2:00 to 10:00 P.M. the previous day as he testified, or else during the interval from the time he was brought home by his co-employees at 10:30 P.M. to the time he reported to the company physician at 8:00 A.M. the following morning, for during his lifetime he had performed hard manual labor without back difficulty up until the Sunday morning, March 27th, when he reported to Dr. Saint at 8:00 A.M., but *436 since that time he has been disabled from performing hard labor by what initially manifested itself as a lumbosacral strain, but which subsequently was indicated to be the permanently disabling condition resulting from a herniated disc.
We believe the very able District Court fell into error in putting upon this plaintiff in a compensation suit the very strict burden of proving that the injury was not sustained at home during the night time hours after the workshift ended and before reporting to the company physician early the next morning.
The accident is preponderantly proved by Fee’s positive sworn testimony that the injury occurred during the workhours, corroborated by his reporting the same to his wife upon his return home, his being in increasing pain through the night which the uncontradicted testimony indicated was spent at home in bed, together with the corroboration of actual physical disability the following morning on his report to the company doctor and the other corroborating medical evidence. The history of the accident consistently given to all examining physicians was compatible with the injuries produced and the course of the disability actually indicated was likewise compatible.
 “Uncontradicted testimony should be accepted as true”, (syllabus) Coleman v. Manufacturers Casualty Insurance Company, 229 La. 105, 85 So.2d 47, citing this “familiar rule of law” as supported by Miller v. Hartford Live Stock Ins. Company, Inc., 165 La. 777, 116 So. 182; Bonanno v. Decedue, 186 La. 1041, 173 So. 756, and Cockrell v. Penrod Drilling Company, 214 La. 951, 39 So.2d 429; which latter case contains the statement, the “courts will not impute perjury to apparently credible witnesses,” 39 So.2d 432.
The District Court held Fee had not proven an accident because: (1) he did not cry out or complain to his co-employees, nor did he discuss it with any of them following the injury; (2) he did not stop work or otherwise manifest distinctly the injury, which the District Court felt impossible if the injury caused not only pain in the back, but pain down the leg, thus indicating a severe ruptured disc.
Plaintiff’s reasons for not discussing his injury with his co-employees are amply indicated by the following excerpts from his testimony.
“A. Well, he told me did I tell my foreman, Dave Johnson? and I told him ‘no’ and I told him how it was and I never — when I first hurt my back I didn’t pay too much attention to it. I hated to say anything when X needed work. Jobs was hard to get and I was afraid it might harm my job that was the reason I never said nothing until along about the next morning and I was feeling so bad I had to have something done.
* * * * # *
“Q. What time did you finish loading that car out that night ? A. Well,
I think it’s somewhere about 6:15. Of course, that’s just a guess I didn’t look to see what time it was.
“Q. Well, was your back hurting you much at that time? A. Well, it weren’t too awful serious, but it was hurting me alright. Right smart, but it weren’t too serious.
“Q. Did it get worse? A. Yes, it finally growed worse but it growed worse after I stopped. Stopped moving around.
“Q. Well, when did you stop moving around? What time did you stop moving around ? A. After I got home.
* * * * * , *
“Q. Now, did you mention anything to-Luster Bass riding home in the truck about your back or to Ben Woods when you were drinking coffee? A. Well, if I did I don’t remember whether I mentioned anything to them or not about it. Til then I was figuring on *437 coming back to work. But my back was so bad the next morning I couldn’t go to work. That’s the reason if I said anything to him or didn’t say is because I was supposed to come back to my job.”
We do not believe Fee’s positive sworn testimony of the accident to be outweighed by any mere inferences from his failure to discuss the accident with his có-employees, especially in view of the facts herein.
At this point it might be well to discuss defendant’s attack upon the credibility of Fee based upon the alleged discrepancies of his testimony with that of his co-employees, which were: (1) Fee testified that the accident occurred as he was “heading” (or turning on its end) a heavy paper roll with just one co-employee, Ben Woods, whereas the others testified that all four co-employees lifted the rolls; (2) Fee testified that while others were working in the vicinity at the time, he did not know who they were since it was too dark to see more than three or four feet away in the boxcar at the time, 6:00 P.M., while the other co-employees stated it had to be light enough to see where to nail nails against the boxcar side to “bracket” (or hold up with metal bands so the paper rolls would not slide), and therefore it was “light.”
We do not find these alleged discrepancies very material so as to bring into question Fee’s credibility, nor are we certain they even are discrepancies. As to the latter, it is self-evident that what may be “dusk” to one man may be “dark” to another or “still light” to yet a third.
As to the former, while it is true the co-employees testified flatly that all four of them “headed” the paper rolls, their testimony also indicates that there were various other steps or occupations in the process of loading rolls of paper from a truck onto the boxcar, such as the “bracketing” referred to, as well as various other operations. Read as a whole, the testimony certainly does not exclude that in the process of performing all the necessary operations of loading the boxcar, plaintiff and Ben Woods were thrown together to perform some of the “heading”, while the others were performing some of the other operations, such as “bracketing", not requiring the full crew.
We must respectfully disagree with the conclusion of the District Court that the record supports a finding that it would be impossible for plaintiff to have received such a severe disc injury as to cause shooting pains in his leg and not to make any outcry or cease work momentarily.
In the first place, Dr. Saint testified that the simultaneous pain in the leg could result from causes other than the ruptured disc, such as a “spasm or a pinched nerve or a terrific spasm of the muscle”, although he also testified that he “would rather expect * * * that the protrusion occurred right at that time.” This doctor testified as follows :
“Q. And if a man spontaneously with the alleged strain that injures him, or put it hypothetically, if he does receive an injury through and immediately and spontaneously he has leg pain, refers to leg pain, wouldn’t you say that that would indicate that the disc occurred immediately as at that time? A. It could be a disc, yes. We have patients who have strains that way who never had a disc and still have pains down their legs. It could be a spasm or a pinched nerve or a terrific spasm of the muscle. He doesn’t necessarily have to have a disc spontaneously to have a pain down the leg, but usually a pain down the leg would come on later after the injury usually points more towards the disc.
“Q. Well, that the point I’m making, doctor, isn’t it more usual for the pain to occur later if the disc is going to come later than for the pain to occur immediately? A. . In the leg, yes.
“Q. Yes. So where the pain is immediately spontaneous you would rather *438 expect — now, this is assuming the man has a disc — that the protrusion occurred right at that time, isn’t that right. A. Yes.
“Q. And that that nerve was affected? A. Affected immediately.”
In the second place, both Dr. George Briel, orthopedic specialist testifying on behalf of plaintiff, and Dr. Daniel Kingsley, orthopedic specialist testifying on behalf of defendant, testified that often or indeed commonly disc injuries do not become symptomatic or painful with the first stress, or first giving of the disc material. Often it takes a series of strains and stresses, or a subsequent stress, until the weakened disc finally permits the nucleous pulposus to protrude so as to impinge upon the nerves to cause permanent pain. Dr. Briel testified:
“Q. What is the usual history, Doctor, where a man sustains a disc as a result of trauma, does he usually complain immediately about his back? A. Usually most of them do. Some of them will complain of their back immediately and some of them will immediately complain of the pain radiating down the leg. In those individuals usually you can get some previous history of possible injury to their back at some previous time and at the time of a more recent strain, what happens is that the disc herniates. Previously what has happened has been the breaking of the cartilage of the disc, but often times you will get a history and findings in these disc cases of purely nothing more than what this man had, apparent lumbo-sacral strain, and as time goes on he shows up neurological findings indicating what has happened is that the disc was broken at that time and has gradually over a period of time pushed out.”
Dr. Kingsley testified:
“I think experience and operations show there’s one type of symptom-atology, then there’s an additional injury which in itself isn’t very great added to the first one — the first one has weakened the disc; the second one really ruptures it, but it wouldn’t have ruptured it without the first one having happened.”
Dr. Pollard’s testimony that it would take an acute and severe disc rupture simultaneously to rupture the disc and to cause pain in the leg, causing severe pain because the “nerve root is rather markedly traumatized at the time” must be read in conjunction with the foregoing testimony. (And, taking into consideration the varying reactions to and thresholds of pain in different individuals, Dr. Pollard’s testimony only is that such an injury would cause severe pain, not that the various individuals concerned could not possibly suffer such pain without outcry.)
Thus, the final strain or aggravation may have indeed been slight but still caused the leg pain, if from prior strains or a prior strain Fee’s disc was weakened so that the comparatively slight strain of pushing up the heavy roll of paper finally caused it to rupture. This nevertheless would be a com-pensable accident within the meaning of the compensation act, or “the giving way of any portion of the laborer’s body while engaged in his work”; Rivero v. Leaveau, La.App., 45 So.2d 418, at page 422 (also involving ruptured disc).
And indeed, it is of more than passing interest in view of this testimony, to note that Dr. Saint elicited from this reticent individual on the morning after the accident a history of at least two stresses as follows:
“A. The examination consists of the personal history of the case. As was brought out he did not allege any injury until I began to try to establish a cause in relationship for his backache and on drawing him out, you might say, he was then able to remember two different incidents of injury. He went back about a month from that date of March *439 27th and alleged of having strained-, his back, right lower back region, in which he felt this stinging pain in that area while doing his routine work from picking up jumbo rolls of paper. He did not report this to his foreman and he alleges that the pain left after three days but his soreness continued. He continued his work and at 6:00 P.M. of March 26, 1955, the day before he came to see me, he alleged that he picked up on a bag roll of paper with a fellow worker named Ben Woods and he felt the same pain again in the same back area. And he stated that — in his own language it seemed that the big artery in his right thigh and leg was pulling.” (Emphasis added.)
In conclusion as to the proof concerning whether an accident occurred, it may be added that apparently when defendant terminated plaintiff’s compensation payments on June 17, 1955, it did so not on the ground that no accident had occurred, but that plaintiff would not return to try light work because he felt the pain too great to do so. Under cross examination, A. A. Cavanaugh, defendant’s personnel manager, testified as follows:
“Q. Now, Mr. Cavanaugh, compensation payments were terminated on June 17th. Now, that wasn’t because you didn’t feel as though this man had sustained an accident, but it was because the two physicians who had recently examined him indicated that he was about well? Or was able to do light duty? A. That’s correct.”
We do not think the medical proof admits of serious doubt that plaintiff is presently disabled by back injury.
The accident occurred on March 26, 1955. Trial was had on October 10, 1955. On September 30, 1955, just ten days before trial, plaintiff was examined by Dr. George Briel, orthopedic specialist, who testified for plaintiff. Dr. Briel found objective symptoms of disability, including muscle spasm, considerable limitation of motion in the back and legs and some flattening of the lumbo-sacral curve. The subjective response to nerve tests were symptomatic of sciatic nerve irritation. Dr. Briel’s diagnosis was that plaintiff had sustained a ruptured disc either between 1^4 and L-5, or L-5 and S-l, in the lumbosacral area of the back. He had seen Fee earlier, on June 21, 1955, at which time he diagnosed merely lumbo-sacral strain of right lumbosacral angle of the back, which in his opinion was the cause of complaints showing some evidence of sciatic nerve irritation. He felt plaintiff should recover froni his disability in a matter of several weeks’ time.
As his testimony quoted above indicates, it is not unusual for the symptoms of the initial lumbosacral strain to overlay the initial effects of a ruptured disc incurred simultaneously, which latter manifest themselves over a period of time as the former symptoms recede. See also in the jurisprudence: Johnson v. Cabot Carbon Company, 227 La. 941, 81 So.2d 2; also, Id., La.App. 1 Cir., 84 So.2d 639; and La.App., 75 So. 389; Michel v. Maryland Casualty Company, La.App. 1 Cir., 81 So.2d 36 and cases therein cited.
Dr. Claude Pollard, Jr., neurosurgeon, examined plaintiff on September 19, 1955, less than a month before trial. He found marked rigidity of the back muscles (or spasm), some flattening of the lumbosacral curve, and limitation of motion as objective symptoms. From these symptoms and the distribution of pain reflected by plaintiff’s subjective responses to tests (which, incidentally, he felt could not easily be falsified), he diagnosed a ruptured intervertebral disc between L-5 and S-l.'
Dr. W. E. Reid, general practitioner at Leesville, examined plaintiff on July 16, 1955, and again on September 17, 1955, the latter examination being less than a month before trial. He found a marked muscular spasm in the lumbar region, indicating objective evidence of pain. From his physical examination and his interpretation of the *440 x-rays, he diagnosed the cause of this genuine pain on the latter examination as a-spondylolisthesis or slippage caused or aggravated by injury. (It should be stated that the two specialists testifying felt that this was an incorrect diagnosis of the cause of plaintiff’s pain and disability.) On Dr. Reid’s earlier examination in July his conclusion was, “In my opinion, Mr. Fee has suffered lumbo-sacral strain with some evidence of damage to the right sciatic nerve. He is not able to do work of any reasonable character at this time.”
Dr. M. S. Stephens, general practitioner at Hornbeck, La., examined plaintiff twice, both times in the vicinity of June 21, 1955. He found muscular spasm and other objective and subjective symptoms and found plaintiff disabled. He felt the cause of the disability to be compression fracture or ruptured disc of the upper back, L-l and L-2.
The testimony of all these physicians indicates a disabling condition in plaintiff’s back, producing both objective and subjective symptoms of pain, which the consensus of the specialists’ opinion indicates to be a protrusion of the disc nucleous by reason of herniated disc in the lumbosacral area of the back. These physicians uniformly regard Fee as disabled from performing work similar to that performed at the time of the accident, for an indefinite period. The two specialists recommended an operation as the sole possible allegation of what in their opinion was a progressively worsening condition of the back.
Against this testimony, defendant produced the testimony of three physicians: (1) Dr. Saint, the initial examining physician, who treated Fee between March 27th and about April 5th (about six months before the trial), for a lumbosacral strain which he admitted to be disabling, but felt was minimal; Dr. Saint did not see Fee after April 5th; (2) Dr. P. M. Davis, Jr., orthopedic specialist, who' examined Fee just once on April 5, 1955, six months before trial, and found from objective symptoms, combined with subjective complaints, that Fee was disabled by reason of a lumbosacral strain which had probably been acute, but was subsiding, and felt Fee could return to full duty in about six weeks and to light duty in three weeks; the patient’s complaints of pain were symptomatic of an injury or irritation to the sciatic nerve; and (3) Dr. Daniel Kingsley, orthopedic specialist, who-examined Fee just once, on June 6, 1955, or four months before the trial; unlike all other doctors who examined Fee, both before and after, Dr. Kingsley did not find muscular spasm or other objective evidence of pain; he felt that Fee could return immediately to the same work he was doing before the accident, although implicit in his testimony is his belief that due to a structurally bad back, plaintiff was not suited for heavy work such as he had been doing to earn his living throughout his lifetime; Dr. Kingsley under cross examination admitted that Fee had subjective “complaints which are somewhat similar to those produced by nerve irritation”, or disc injury, and that his diagnosis of no disability was at least-tentative is somewhat indicated by his concluding recommendation that Fee return to light work and “If there is actually any disability present, it will be possible to increase it and thus recognize it objectively.”
It will thus be seen that defendant’s medical testimony is compatible with that of plaintiff’s taking into consideration that defendant’s doctors saw Fee in the early stages of what was admittedly a condition which initially often does not manifest objective symptoms to a marked degree which fact these medical witnesses also frankly admitted.
Defendant urges that the lack of atrophy in plaintiff’s affected leg indicates lack of pain. The physicians stated that atrophy often accompanied pain in a member, due to lessened use of same, but they further stated that atrophy is not produced unless the leg is used less relative to the non- *441 affected member. That is, lack of atrophy-does not indicate lack of pain; atrophy itself does not indicate the presence of pain, but the absence of use.
Defendant further urges that the presence or absence of ankle reflexes in the various medical examinations of plaintiff is significant. However, Dr. Pollard testified that such variation is significant chiefly in determining whether at the time of examination plaintiff is undergoing a period of attack of the symptoms, or on the other hand, or remission (or lessening) of the symptoms, produced by the ruptured disc.
Thus we feel that plaintiff has borne the burden of proving with legal certainty permanent and total disability by reason of industrial accident, and judgment will be rendered accordingly.
Finally, counsel for plaintiff complains that the District Court allowed only $25 as expert witness fee for testimony of each witness testifying, whether general practitioner or specialist, and urges that the expert witness should receive a higher fee than the general practitioner, citing Henderson v. New Amsterdam Casualty Company, La.App., 80 So.2d 438, Kelly v. Ozone Tung Cooperative, La.App. 1 Cir., 36 So.2d 837, and English v. Kellogg Lumber Company, La.App., 200 So. 167. We think this contention is sound.
LSA-R.S. 13:3666 provides that in fixing the compensation of expert witnesses, the court shall take into consideration “the value of the time employed and the degree of learning or skill required.” A specialist requires a greater degree of skill or learning as to his specialty than does a general practitioner. The fees of the specialist witnesses will be increased from the $25 allowed to the $50 prayed for, being: Dr. Claude Pollard, Jr., Dr. George Briel, Dr. P. M. Davis, and Dr. Daniel Kingsley. The fees of the general practitioners who testified by •deposition from their office will be maintained, as fixed by the District Court at $25, being: Dr. M. S. Stephens and Dr. W. E. Reid; the fee of Dr. C. L. Saint, who came to court to testify and therefore employed a greater amount of his time which therefore has a greater value, is increased to $50.
It is therefore ordered that the judgment of the District Court be and the same is hereby reversed and set aside and that there now be judgment in favor of the plaintiff, William Fee, and against the defendant, Calcasieu Paper Company, Inc., for compensation at the rate of $30 per week during the period of his disability not to exceed 400 weeks, beginning on and after March 26, 1955, subject to credit for compensation heretofore paid, together with interest at the rate of 5% per annum from maturity on all past due installments until paid, and for all costs of this proceeding.
It is further ordered, adjudged and decreed that plaintiff’s right to recover medical expenses, within the statutory amount (subject to a credit for amounts spent by defendant for treatment of plaintiff), shall be reserved.
It is further ordered that the fees of the physicians testifying as expert witnesses in the trial of this case be assessed as costs in the following amounts: Dr. Claude Pollard, Jr., $50; Dr. George Briel, $50; Dr. P. M. Davis, $50; Dr. Daniel Kingsley, $50; Dr. M. S. Stephens, $25; Dr. W. E. Reid, $25; Dr. C. L. Saint, $50.
It is further ordered that the fee of Wood and Jackson, attorneys at law, is hereby approved and fixed in the amount of 20% of the amount collected, not to exceed $1,000.