ELLIS, Judge.
This is a compensation, suit in which the plaintiff seeks to recover compensation in the maximum amount allowed for total and permanent disability resulting from a hernia allegedly sustained as the result of his having been struck in the groin by a board while in the employ of the defendant, Long-Bell Lumber Company. Also joined as a defendant, is the insurer of the lumber company.
Counsel for defendant in his brief limits the issues by making the following statements :
“According to the allegations of the petition,, which are not in that respect disputed, the plaintiff was earning a wage sufficient to entitle him to Thirty & No/100 ($30.00) Dollars per week during the period of his disability, if, in truth and in fact, he did sustain a hernia while performing services incidental to his employment in the course of his employer’s trade. Likewise there is no dispute as to the fact of the employment nor is there any dispute as to the fact that at the present time the plaintiff is suffering from a left inguinal hernia.
“The sole dispute, which is entirely a factual one, is whether or not the hernia from which the plaintiff is admittedly suffering was sustained in the course of his employment.
“The District Judge, in a written opinion, resolved this factual question adversely to' the plaintiff and rejected his demands in toto.”
It is from this judgment that the plaintiff is devolutively appealing.
It is shown by the evidence that the plaintiff worked for the defendant lumber company at irregular intervals from' 1920 until the date of his alleged accident and-injury on December 7, 1951. On the date of the alleged accident he had been working for the lumber company since March of 1947.
The plaintiff testified that on December 7, 1951 at about 2:30 P. M. while working “on the knot saw” which was one of two such small saws located on opposite sides of a bench or table, and used to saw knots out of boards. These boards -were mechanically conveyed from a matching machine which was located approximately 30 feet from the knot saw. The plaintiff stated that one of these boards in some manner became hung in the matching saw or machine and was kicked back when the operator of the matching machine released it, striking the plaintiff as stated by the Court in the transcript “approximately in the groin about four or five inches below the belt” on his left side. While the testimony does not in detail describe the rollers or the matching machine, the rollers apparently worked on the same principle as the rollers on a wringer-type washing machine, and pulled the board into the saw or saws which turn in an opposite direction from which the boards were coming. When the rollers are released this frees the board and it would be thrown in the opposite direction by the force of the saw.
At the time of the accident the plaintiff felt a stinging pain and “turned sick at my stomach”, however, he continued to work without an outcry or complaint until approximately 3:00 o’clock when they were given a short rest period, at which time he told a fellow employee, Edmond Howard, that “he got hit in the side with a piece of lumber and believed he was going to have to ask the boss to let him go to the doctor * * Plaintiff continued to work until quitting time, and when he got home he was sick at his stomach and his left side was -hurting him and he went,to bed without eating any supper. On the following day, which was Saturday and an *454 off day from work, plaintiff stayed in bed most of the day, and also on Sunday, and on Monday morning' he went to1 see Dr. Strecker, who was in the employ of the lumber company, where he was examined and told to return the following Wednesday when he was again examined and told by the company doctor that he had a hernia and that he should have an operation.
The defendants rely upon expert medical testimony to the effect that a man receiving a hernia from the force of a blow from a board as described by the plaintiff would be rendered incapable of proceeding with his work, and it would probably make him sick and probably prostrate him for at least a short period of time, and would at the point of contact “rupture some small blood vessels or capillaries which would in turn be evident as a bruise or an extravasation of blood under the skin or into the skin and soft tissues, and would be noticeable as the changes in the hematin or contents of the red cells took place, the usual change from blue to orange to lemon colored and' on to disappearance over a period of days to two or three weeks would take place,” which would be evident to a physician who examined the plaintiff two days subsequent to the striking of the blow. Dr. 'Strecker testified that he found no bruises on the plaintiff at the time of his examination on Monday following the alleged accident on Friday, however, both plaintiff and his wife disputed this in that both testified he had a knot and a bruise where the board had struck him.
The defendants also offered the testimony of the plaintiff’s fellow employees who were working a distance of three to ■thirty feet from him at the time he says the board struck him. All of these co-employees testified that nothing unusual happened as far as they knew, that the plaintiff made no outcry, and that they never saw a board come back out of the matching machine and strike plaintiff, nor did the plaintiff complain to the superintendent or any of his fellow employees that he had been injured, nor did he notify his foreman, George Dion, that he had been injured in accordance' with the company rules which were posted in the building. The defendants also rely upon the testimony of Dr. Strecker to the effect that the plaintiff did not tell him that he had been accidentally injured while at work, however, at this time it might be interesting to note that Dr. Strecker on the second examination, which was on Wednesday, December 12th, in response to a question as to whether the plaintiff told him that on the preceding Friday he had been struck in the stomach with a board, answered: “No. I only heard he had been struck by a board. I don’t know how I heard it. It came to me sort of indirectly. It never came out of his mouth.” It is not shown that Howard, the fellow employee to whom plaintiff complained at. the rest period of having been struck by the board, told anyone of the complaint, and plaintiff had remained at home from Friday night until Monday morning and only his wife and a visiting friend knew of the alleged accident according to the testimony, but one thing is certain: the doctor had to learn this from someone who knew it, or had heard it.
It is not necessary, in order to overcome the testimony of the defendant’s witnesses, to' depend solely upon the plaintiff because he is corroborated in many respects by the testimony in the record. It is definitely shown that prior to his employment in 1947 he was required to take a pre-medical examination and was specifically examined for 'hernia, and at that time he had none. The record shows that he was a steady worker, with no accident record or claims for previous compensation except that at one time he had bumped his back according to his own testimony. He was also known as a quiet man who did very little talking and he testified that he continued to work on the date of his injury because he had been struck before and suffered no serious effects and he thought that it would pass off, and to have told anyone at that time would have necessitated his stopping work as there was a great deal of noise going on as the result of the running machinery and the saws. However, he did complain within thirty minutes after it happened to a co-employee named Howard who testified very straightforwardly, and *455 there is no doubt from his testimony that the plaintiff did tell him that he had been struck by a board. Plaintiff is 'further corroborated by the fact that when he got home he went to bed with pains in his side, failed to eat any supper, and was administered aspirins by his wife who corroborated his testimony and said that plaintiff had told her that something had hit him, and he showed her his side where he said he 'had been struck and she saw a blue mark, and she also testified that he stayed in bed all day Saturday and Sunday and that on the latter day a Mr. Jackson and his wife came to visit them and spent the day. The witness Jackson testified that he 'had spent the day at plaintiff’s home on Sunday following his accident and when he got to the house the» plaintiff was in bed and that he remained there while he was at the house and that the plaintiff did not eat any dinner. He testified that the plaintiff ■told him that he was hit by a board and that the lower part of his stomach on the left side was hurting him.
The plaintiff is also corroborated by Dr. Strecker, the company doctor. Dr. Strecker was asked the following questions and gave the following answers:
“Q. Doctor, did you on or about December 10, 1951 have occasion to examine Elmo Bailey, the plaintiff in this matter? A. That’s right, I did.
“Q. Will you please state, Doctor, what his complaint was to you, what type of examination you conducted and the conclusions at which you arrived as a result thereof? A. Elmo came in the office here. I know him real well. He came here for treatment first thing. Now, when he came up to the office that day he said he had a pain in his side and I examined him. I will just tell you the whole thing, now. I told him to come back in a few days. I didn’t say anything about this hernia. I am going to tell you why it was I didn’t tell him he had a hernia the first time he came. I told him he had a strain on his side there and he was to come back in a few days for re-examination. I didn’t dismiss him or anything but told him we would wait a few days, and he did come back in two or three days as I had told him to and I then told him that he had a hernia.
* * * * * *
“Q. Before December 10, 1951, as his doctor you did not have any knowledge of him having any hernia condition? A. That’s right.
“Q. Prior to that time. A. If I had, I would have jerked him off the job.
“Q. You had occasion to administer to his needs for several years prior thereto? A. That’s right.
* * * * * *
“Q. Doctor, you say when you examined him that morning on December 10th there was some tenderness present on the side where he complained of? A. That’s right.
“Q. Now, that tenderness being present at the site where he complained made you think he had sustained some kind of injury within the past two or three days in that area of his stomach where it was tender? A. That’s right, from his history and him being here.
* * * * * *
"Q. Doctor, you say there was a certain amount of tenderness and soreness in the side where he complained of that morning? A. Yes.
“Q. That made you think as a doctor that he had sustained either a strain or a direct trauma to that side to cause that soreness and tenderness which you found, is that right? A. Yes, that’s right.
“Q. At that time did you find a little lump or knot on either the left side or right side of his stomach? A. Yes, when I examined him, that inguinal canal, palpated in there, there was as you say, a knot.
“Q. Was it sufficient that you could see it with your eye ? A. No.
* * * #
“Q. The reason he was so hard to examine on the first date of examination, which was December 10, 1951, was because of the soreness and the *456 tenderness in his side, is that right? A. That is right.
******
“Q. Would you say, Doctor, since you did find the tenderness and soreness present in Mr. Bailey’s stomach on December 10, 1951, that within two or three days prior to that date Mr. Bailey had sustained some kind of an injury or trauma to his stomach? A. That’s right.
“Q. Wouldn’t it he your opinion as a doctor that the soreness and tenderness which you did find in his stomach on December 10, 1951, was caused by the sustaining of a hernia condition within two or three days prior to that time ? A. Here is the thing now you have got to consider. This man might have had a hernia and whatever he got on the job might have made it flare up more. I don’t want to get out on a limb with either one and say that thing that happened December 7th was the beginning of the hernia. He might have had a hernia and something happened down there and it became acute. Whether he developed a hernia on the 7th or not, only the Lord knows and Mr. Bailey.”
The plaintiff also offered the testimony of Dr. William Reid who examined him on May 1, 1952. This doctor testified that it was possible for a man who had been struck in his stomach and sustained a hernia by the trauma to continue working three or four hours after sustaining the trauma. On this subj ect -specifically he testified: ■
“A. I mean to say this, he might get struck in the stomach -to cause a hernia and knows, usually, when such a lick is sustained, and he needs to rest, but they don’t all do it. Some of them try to work on but after a while he gets bad enough that they have to quit.
“Q. But that is the exception rather than the rule? A. That is right.”
Regardless of the fact that the plaintiff failed to become incapacitated- at the time of the blow or to cry out or notify his fore-mam or any other fellow employee other than Howard, and the testimony of the medical experts, we are of the opinion, from all of the testimony in this record which has been quoted somewhat in detail, that the plaintiff has proven his case and is entitled to judgment.
Although defendant stated that the plaintiff was earning a wage sufficient to entitle him to $30 per week during the period of his disability, plaintiff is limited by the prayer of his petition in which he asks for “65% of his daily wage, $7.20, payable weekly”, and -the only testimony with regard to his earnings was that he was making 90‡ per hour or $7.20 per day and that he worked five days a week or 40 hours, which would be $36 per week, and 65% of this would be $23.40.
It is therefore, ordered that the judgment of -the District Court be reversed and judgment is hereby rendered in favor of the plaintiff and against the defendant awarding him compensation at the fate of $23.40 payable weekly not to exceed 400 weeks, beginning December 7, 1951, with legal interest on all past due amounts from their maturity. It is further ordered that the defendant pay all costs.