ELLIS, Judge.
Plaintiff is seeking compensation as the result of an alleged accident on June 22, 1954, while employed by Graver Construction Company for total and permanent disability less thirteen weeks compensation previously paid, together with reasonable medical expenses and a penalty of 12% on all past due benefits until paid, together with an attorney fee.of $750.
The defendant’s answer was a general denial and the case was duly tried and judgment rendered in favor- of the defendant, from which the plaintiff has appealed.
Plaintiff was a carpenter by trade, and on June 22, 1954, had been employed for ap *244 proximately two years by Graver Construction Company. During most of his employment with this company he had been working as a foreman but there had been a reduction in force and he was doing heavy carpentry work, and on the particular date of the accident he and Felix Labouve were engaged in bolting three x eights onto steel plates, and it was necessary that they carry each piece of timber. While doing so, in going down an incline or “hill”, the plaintiff tripped but did not fall but “twisted my back.” He continued to work for about fifteen or twenty minutes and then for the rest of the afternoon he did nothing but wait for the truck that took the men to and from work. His foreman, Shelton Chaumont, was on the truck when it came to pick up the workmen and plaintiff reported the accident to him.
The next morning the foreman gave him a slip to go to First Aid and from there he was sent to Dr. Briel. Dr. Briel diagnosed plaintiff’s injury as “a sprain of the gluteus muscle fibers and te?/dons.” Dr. Briel stated that on this examination, June 23, 1954, his findings were limited to “a tenderness over the fibers just lateral to the sacro iliac joint and along the posterior rim of the ilium.”
In view of the fact. that we are now dealing with the question of whether plaintiff suffered an accident, we will not discuss Dr. Briel’s testimony in detail until we consider the question of disability.
The plaintiff’s testimony as to the accident is corroborated in full by his fellow employee, Labouve. This witness stated, “We was fixing a dam for the skimming pit and we was putting 3x8’s on that and we started carrying it and he stumbled.”
Shelton Chaumont, plaintiff’s foreman, stated that about 3:30 P. M. he went “to pick up the men and that was when I heard about the accident.” At this time plaintiff told him he was feeling “sore in his back,” but that it was too late to go to First Aid, and this foreman told him that if he still hurt the next morning he would take him to First Aid, and the next morning “it looked like the man was hurting more than he thought he was so I took him to First Aid.”
Plaintiff was not satisfied with Dr. Briel’s examination, which he testified was very brief and superficial, and he then went to see Dr. Crookshank. This doctor testified that plaintiff told him that he was working at a skimming pit and “was placing a 3x12 piece of lumber and strained his back, supposedly about 10 A. M.” The doctor found muscle spasm of the lower back muscles and limitation of stooping and lateral motion and tightness of the back muscles on flexion of the trunk, and no evidence of any neurological involvement. X-rays were made at the doctor’s request on June 28, 1954 and they showed a congenital second degree spondylolisthesis, which is an instability of the joint where the body of one vertebra slips on the other.
Defendants question the accident and the learned Judge of the Lower Court commented upon the same for the reason that Dr. Briel stated that the plaintiff told him that “He was putting steel bolts into plates and 3x8’s when he pulled on a wrench and he felt a sudden hot pain in the lower part of his back,” whereas plaintiff testified and told the other doctor that he injured his back while carrying a 3x8 when he slipped. It is also shown that plaintiff stated that these 3x8’s were to be bolted onto two steel plates and naturally in the bolting process wrenches would be used. In view of the fact that there does not seem to be any question of the occurrence of the accident in the manner testified to by plaintiff as he is corroborated by his fellow employee who was helping him to carry this 3x8, and in view of the fact that a description of the work he was doing would include the use of the wrench in bolting the 3x8’s to the steel plate, it is more than likely that Dr. Briel in writing his report became confused in which portion of the process plaintiff suffered an accident. Every doctor that examined plaintiff found some evidence, of injury, which is corroborative of the testimony as to the occurrence of an accident. We believe from' the *245 testimony that an accident has been amply proven.
As to plaintiff's disability, it is shown that he followed his trade after being discharged by Dr. Crookshank in September of 1954 to return to light work with only the usual loss of time necessary to locate new employment at the termination of previous employment. This is subject, however, to testimony that the plaintiff attempted to do some heavy work and the pain became worse in his back and he had to quit and secure light work. However, plaintiff has proven by a preponderance of the testimony that during the time he was working he did only that which was considered light work in his trade. His employer, P. B. Flowers, knew of his weak back and instructed his foreman to go easy on him because the plaintiff was a good worker and he had plenty of light work for plaintiff to do.
L. E. Hennigan, business agent for the Carpenters’ Union, testified that the plaintiff applied to the Union for work after having been off some two or three months and “specifically asked for light duty or trim work” or anything else where he would have to do no particularly heavy work. He told plaintiff that most construction jobs were void of light duty but there was a possibility if plaintiff was referred to a job that he could talk to the job superintendent who might assign him to trim work. Hennigan testified that on a few occasions he had definitely assigned plaintiff to work in which there would be no lifting. It is also shown by this witness that he discussed two jobs with the plaintiff but that the latter turned them down, presumably due to the heavy nature of the duties.
Edward- W. Millstead, Jr., testified that he worked with plaintiff on two jobs, Wein-garten’s store and on the Dave Miller job at Firestone, which was light work. This witness stated that if the plaintiff had not been kept on lighter work he could not have handled the job. It was on the Wein-garten job that plaintiff was boring holes in 2xl2’s with an electric drill when it hung up and struck him in the chest. He was sent to Dr. Alexander as a result of this accident but there is nothing in the testimony to reveal that it had any significance on the back condition which plaintiff claims is disabling.
Another fellow employee, Roland Fon-tenot, testified that he worked with the plaintiff on the Bass job at Sulphur and the Miller job at Firestone in 1955. On the Bass job he and plaintiff were hanging sheet rock but the plaintiff was unable to do this work on account of his back and after four and a half hours he quit. On the Miller job at Firestone, this witness stated that the plaintiff was doing mostly light jobs, and that he noticed that while plaintiff was working “he handled himself like he was kind of hurting. You could tell by the way he handled himself.” This man had also worked with the plaintiff on a Stone & Webster job building a power house in 1949 and stated that as far as plaintiff’s physical condition was concerned, “I couldn’t see nothing wrong with him then.”
Murphy Miller, witness on behalf of plaintiff, stated that he was a carpenter and had worked with the plaintiff on two different jobs, viz., the Honeycutt Furniture Store and Trinity Baptist Church, and that on the former they were fixing window casings for a show window and in doing so it was necessary that they tear out some of the old stuff in order to build the new. They also moved some steps. He stated that he and plaintiff were working as partners and were supposed to do trim work which was considered light work on the Honeycutt job, and that one morning (date not given) plaintiff acted as if he was hurting and left the job to see a doctor.
Plaintiff also offered the testimony of a neighbor, Edward Manuel, and of Jesse Fontenot, who at the time of the trial occupied part of plaintiff’s home. Both testified that prior to the accident plaintiff worked steady and never complained, but that subsequent to the accident he appeared to be suffering and slept at times upon the floor or a hard bed.
*246 Therefore, from the above and foregoing we conclude that the plaintiff suffered an accident and injury to his back, and that after approximately three months treatment he returned to regular employment insofar as his trade was concerned but this employment, it is shown by a preponderance of the testimony, was composed of light work, and as to the degree of disability from a medical standpoint we will now proceed to discuss such testimony.
It is admitted by all doctors that plaintiff is suffering from spondylolisthesis, second grade, and that x-rays revealed quite a bit of slippage of the fifth vertebra. Dr. Briel was called on behalf of the defendant and his diagnosis has previously been given, however, he further testified that in his experience with spondylolisthesis he could not remember any case in his experience where he could say definitely that an individual had a sudden slippage without having a considerable amount of spasm in the lower back. He further stated:
“ * * * The only way I have ever felt that we could be certain of that would be to have an X-ray just before the accident happened of his back, and an X-ray afterward. I don’t believe that any proponent of the traumatic theory or the congenital theory of spondylolisthesis have any absolute proof of what happens in the spondylo-listhesis.”
This doctor further stated that the x-rays of the plaintiff showed “you have practically no intervertebral disc remaining between D-5 and S-l”. It was his opinion that the plaintiff’s grade 2 spondylolisthesis which he observed in the x-rays did not occur as a result of the accident on June 22nd but that it had gradually taken place over a number of years “and as the ligaments and musculature have gradually stretched and given away as an individual such as that has done in his work and exercise, then this slippage gradually occurs. I do feel that the ligaments and musculature which hold a spondylolisthesis in place are definitely weakened by that slippage and as a consequence those ligaments and musculature can be injured more easily than they would if they were in a normal condition.”
This doctor was of the opinion that persons with a back condition such as the plaintiffs, after they have injured themselves and once become symptomatic, whether as the result of direct trauma or over a period of time that they will clear up and definitely resume the condition which existed before the accident. Dr. Bri-el stated that when he examined the plaintiff in the hospital while Dr. Crookshank was treating him on June 28, 1954, that he found muscle spasm and that Dr. Crook-shank had placed plaintiff in traction in order to reduce this muscle spasm. He stated that “it was true muscle spasm,” and when asked to account for the fact that he had none when he examined him on June 22nd, he stated: “That does happen.”
The Court questioned Dr. Briel as follows :
“The Court: As I understood your testimony, you feel that that slipping had all occurred gradually .and there was no additional slipping as a result of the accident that he reported oni June 22.
“The Witness: No, I did not testify to that. I testified I didn’t think all of this occurred at the time of his accident on the 22nd. Now, whether he had any additional slippage I couldn’t tell, and I don’t think anyone could tell fromi looking at X-rays such as that.
“The Court: I thought I understood you to say that if there had been any additional slippage there would have been considerably more muscle spasm..
“The Witness: Well, I feel that there should be.
“The Court: In your opinion there was not any great amount of slippage as a result of the accident as he reported on June 22.
“The Witness: That’s right.
“The Court: Doctor, I assume this;That in an instance where there is *247 spondylolisthesis there is a gradual slipping and eventually it reaches a point where it either pinches nerves or causes some symptoms of pain. Is that correct? .
“The Witness: As a usual rule it does, although I had an opportunity to examine a man sixty-five years old for something else not so long ago and in taking X-rays this man had a grade 3 spondylolisthesis and he said he had never had any backache in his life.
“The Court: In cases where there are symptoms of pain, or when symptoms of pain do develop, can trauma bring about those symptoms of pain?
“The Witness: Yes.
“The Court: Now, if it does bring about the symptoms of pain and then the patient either receives treatments or in the course of time the pain disappears, then will his back be in as good condition as it was immediately prior to the trauma that caused the pain?
“The Witness: I will have to answer it this way: I will say if the man had -a sprain of the surrounding ligaments which hold those two vertebra which Rave slipped on each other, if he has a ■sprain of those ligaments, which means he has a certain amount of tearing or •stretching with subsequent pain and ■disability, then I feel that the individual is subsequently — those ligaments .are subsequently weakened to the point where further sprains may occur, or •even further slippage may occur, but it is so gradual that it is very difficult to even pick it up in an X-ray over a period of several years sometimes. You can’t see any change in those spondylolisthesis.”
Dr. Crookshank, witness on behalf of plaintiff, testified that when he examined the latter shortly after the accident he found muscle spasm of the lower back ■muscles, etc. supra, and that the x-rays-which he had made show congenital sec•ond degree spondylolisthesis of 1^5 on S-l and that a laminal defect on the right side with partial obliteration of the fifth lumbar interspace, - with no other evidence of any fracture or dislocation. He started the plaintiff out with microthermic treatments, light work and anti-spasmodics, and later on he hospitalized him, put him om a hard mattress and he was given traction:His diagnosis at this time was a sacral muscle strain with a possible ruptured or injured intervertebral disc. His treatment began in June, shortly after the accident, and was terminated on October 1, 1954. He discharged plaintiff to do his regular work, which plaintiff had told him was relatively light carpentry work. This doctor stated that on August 20, 1954, his notations on the plaintiff were “He is improving. Today we have no neurological involvement and there is little muscle spasm.” On 9-3-54, “patient stated he feels no more pain in the back but he has done very little work. He was advised to start light work and return to see me in two weeks. 9-17-54, patient states he feels no pain. He had done some light work and is going to try his regular work. At that time I found no neurological involvement and very slight, if any, muscle spasm.” Dr. Crookshank in the beginning had found a sciatic nerve irritation.
On January 31, 1955, plaintiff came to Dr. Crookshank with a complaint that his back had been hurting and he had had some trouble, on a couple of jobs, but that he just kept on working and hadn’t made any mention of it. On this visit he examined plaintiff and found muscle spasm “more marked on the last visit, * * * The plaintiff remained under the doctor’s care from January 31 to February 8, 1955 and was given heat treatments during most of this time. It was Dr. Crookshank’s opinion that on the occasion of his last visit and treatment in January and February, 1955, plaintiff could not have done any heavy work without pain.
Mr. Crookshank stated that spondylolis-thesis could be aggravated by strain or trauma and that plaintiff’s had been aggravated. He testified that he had treated plaintiff’s wife in the latter part of 1955 *248 and that she came to his office with plaintiff but that on those occasions he could not recall whether plaintiff had made any complaint to him that his back was still bothering him.
Dr. Charles V. Hatchette testified on behalf of plaintiff that he had examined the latter on July 9, 1955, and his chief complaints were constant low back pain, aggravated by any attempted lifting, and he stated that while employed as a carpenter for Graver Construction Company at Cities Service Refinery, “He was carrying a 3x8x20 board when his foot slipped, and in attempting to prevent the board from falling he twisted his low back region in some way. He felt a burning type pain in the mid low back region associated with weakness. * * * ” The plaintiff gave him no history of any previous injury to his back and as a matter of fact, there is no record of the plaintiff ever having suffered with his back prior to the accident of June 22, 1954. Dr. Hatchette had x-rays made of the plaintiff which showed the Grade 2 spondylolisthesis in the fifth lumbar vertebra and the first sacral segment with narrowing of the lumbo sacral interspace. He testified as to his opinion of the plaintiff’s condition as follows:
“My opinion at that time was that Mr. Hebert had a grade 2 spondylolis-thesis of the fifth lumbar vertebra on the first sacral segment, and it was my belief that he was not able to carry on the usual duties of a carpenter at that time. I stated that I did not know whether or not there had been additional slippage of the vertebra as a result of the accident above described, but must assume so due to the fact that his complaints dated from the time of the accident. The treatment of Mr. Hebert resolves itself in a spinal fusión with probable removal of the lamina on both sides of the vertebra, and it was also my opinion that he was getting some nerve root compression as evidenced by complaints of pain and numbness in the lower left extremity, and it was also my belief that this had no bearing whatsoever on a ruptured intervertebral disc, but was the result of slippage of the fifth lumbar vertebra on the first sacral segment.
“Q. How does that slippage cause this sensation of pain and numbness in the leg? A. By pressure against the nerve radicles, pressure against the fifth lumbar nerve. When the vertebra slips it carries with it soft tissues which compress the nerve root against another part of the vertebra and causes what we call a compression against the nerve root.
“Q. Could you give any idea as to how long this man would be disabled without the operation ? A. Well, it is my opinion that his defect is certainly a permanent thing and I could and I could not say how long he would be disabled. As far as I am concerned, it is indefinite. There are some cases of spondylolisthesis without even knowing it, but when they become symptomatic then the estimation of disability is certainly an indefinite thing. No one can tell when they will be relieved of pain, or whether or not they will be relieved of pain, and about the only way that they can be relieved is by operation.”
On cross examination, Dr. Hatchette stated that spondylolisthesis was a congenital condition and he could not say how much slippage plaintiff had prior to his alleged injury; that it might have slipped a great deal and the injury might have caused some additional slippage but that he could not determine this without seeing x-rays of the plaintiff’s back prior to the injury, and of course, none exist as plaintiff had no complaints with his back prior to the injury. The doctor felt sure that the condition had been present for a very long time and he felt that any accident the plaintiff had, “assuming his statements are true and correct, only aggravated a preexisting condition.” Of course, from a legal stand point, it is immaterial whether the accident and injury actually caused the condition or aggravated a pre-existing condition which brought on plaintiff’s disabil *249 ity. He was positive in his statement that heavy duties are more prone to bring on an aggravation of spondylolisthesis than light duties, and he also stated that he did not believe that an individual with Grade 2 spondylolisthesis who has become symptomatic, that is, with complaints of pain, should do heavy work, for as a general rule once a person with a spondylolisthesis has an accident and begins to have pain, they continue to have the pain and difficulty with their back until it is relieved by surgery. One important statement made by Dr. Hatchette in his testimony was in answer to a question by the Court to the effect that if the plaintiff did experience pain from his particular back condition, is it probable or improbable that he would have had muscle spasm. He answered: “Strangely enough very few spondylolisthesis cases have muscle spasm and we do not find positive straight leg raising in these cases.” Furthermore, this doctor positively testified in answer to the court that once spondylo-listhesis becomes symptomatic it usually remains that way, and once an individual gets a back injury with spondylolisthesis they are always prone to get another one “with the least little strain.” He was positive when questioned by the Court that there was nothing to indicate in any way that plaintiff could do heavy labor. It was also his belief that the plaintiff had the pain of which he complained. He was in agreement with the testimony of the other doctors that plaintiff’s condition could be caused over a period of time or by sudden strain, however, in either event plaintiff would be entitled to compensation if the congenital weakness which he had caused the break down in any part of his body that was disabling as a result of heavy work he was doing at the time of the injury, or if the accident aggravated his condition to a disabling degree.
The plaintiff has definitely proven an accident in this case and has shown that pri- or to the accident on June 22, 1954, there was no record of any trouble with his back nor any complaint by the plaintiff himself as to any pain in his back, and that he performed heavy manual labor, whereas after the accident the x-ray revealed the spondy-lolisthesis which is a congenital condition, and a slippage of about one inch, together with muscle spasm and tenderness and complaints of pain, and he was treated for approximately three months by Dr. Crook-shank. It is further shown that the plaintiff engaged only in light duties connected with his trade after being discharged by Dr. Crookshank shortly prior thereto, up to the date of the trial. He had to quit one job on account of the heavy duties causing his back to pain him.
The medical testimony preponderates in favor of the theory that plaintiff’s condition could have been and was aggravated by the accident on June 22, 1954, or that it could have caused the entire slippage. In either event, the result of the accident was disabling to the plaintiff to such an extent that Dr. Hatchette was definitely of the opinion that his disability was indefinite and that he should not and could not do any heavy work, in other words, as a result of the accident and injury on June 22, 1954 plaintiff suffered a permanent and total disability.
The learned judge of the District Court based his opinion upon a finding that it appeared to him that plaintiff became symptomatic as a result of the accident which occurred on June 22, 1954, but that by September of 1954 he became assymptomatic and was as able thereafter to work as a carpenter as he was before the accident occurred. We cannot agree with this finding in yiew of the testimony which has been discussed in detail above, viz., that plaintiff was unable to do heavy work, and it is not shown that he successfully performed any heavy duties as a carpenter after his accident and injury on June 22, 1954. The entire testimony shows that he performed only light duties, and it was positively the opinion of the medical men that once a person becomes symptomatic with a spondylolisthesis condition, it is subject to aggravation with the least strain and particularly by heavy work. As stated, we do not believe from the showing in this record that plaintiff could perform the same type of heavy work he was doing prior to *250 the accident and that his only relief could come as a result of an operation to fuse the back, which is classified as a major one.
As to plaintiff’s claim for penalties and attorney fees we do not believe that this record would justify their imposition.
Accordingly, the judgment of the Lower Court is reversed and it is now ordered, adjudged and decreed that there be judgment in favor of plaintiff, Lester Hebert, and against the defendant, Hartford Accident and Indemnity Company, awarding the said Lester Hebert compensation in the full sum of $30 per week beginning June 22, 1954, for permanent and total disability not to exceed 400 weeks, less compensation previously paid, with legal interest from maturity on all past due installments until paid.
It is further, ordered, adjudged and decreed that the fees of the medical experts testifying in this cause be taxed as costs, and that all costs be paid by the Hartford Accident and Indemnity Company.