96 So.2d 621 (1957)
Tommie B. WHITE, Plaintiff-Appellant,
v.
CALCASIEU PAPER COMPANY, Inc., Defendant-Appellee.
No. 4424.
Court of Appeal of Louisiana, First Circuit.
June 4, 1957.
Rehearing Denied June 28, 1957.
Writ of Certiorari Denied October 8, 1957.
Wood & Jackson, Leesville, for appellant.
Gist, Murchison & Gist, Alexandria, for appellee.
TATE, Judge.
Plaintiff's suit for workmen's compensation benefits was dismissed on the ground that he had not borne his burden of proving that an accident had occurred in the course of his employment with defendant, as the cause of his disability.
Plaintiff White filed suit alleging that he was injured at work "on or about December 10, 1953." At the initial hearing, he produced evidence that he was injured in defendant's machine room, transferred to the lighter outside guard duty a few weeks later, re-transferred back to the heavier inside work but found he was unable to continue working, and hence for the first time on January 26, 1954 reported his accident and injury to his employer. (He had thought the pain would pass off; instead, he testified, it increased.) White, several co-workers, and his wife all estimated, with varying degrees of certainty, that the accident had occurred in December of 1953.
Defendant produced evidence that White had been transferred from the machine room to guard duty on September 11, 1953. Therefore it was impossible that the described accident could have happened in December, 1953.
The District Court permitted plaintiff to reopen the hearings on an amended and supplemental petition that the accident had truly happened in August, 1953, and that plaintiff had been mistaken in the earlier testimony that the accident had occurred in December. But, principally on the ground of the variance in the testimony as to the date of the accident, the conscientious District Court held that plaintiff had not proved the industrial accident in the course *622 of employment upon which his claim was based.
It should be remarked at this point that there is no substantial doubt as to plaintiff's total disability by reason of a ruptured intevertebral disc or nerve root irritation in the lumbar region of the back, as corroborated by Dr. Sutton and Dr. Claude Pollard, neurosurgeons, Dr. Overdyke and Dr. Hatchette, orthapedists, and Dr. Reid, a general practitioner. Dr. T. E. Banks, a specialist employed by defendant, who had initially diagnosed the condition, himself admitted that his last examination on March 20, 1955 (prior to the examinations by these other physicians) might have found plaintiff's disc condition in a state of "remission", i. e. where the symptoms were not readily observable. (The only other physician involved, Dr. Schneider, examined plaintiff once on May 10, 1955, soon after Dr. Banks' final examination at the request of a former counsel for plaintiff and found no symptoms; which likewise in view of the overwhelming contrary testimony must be regarded as explained by the same reason, i. e., that the symptoms were in a period of "remission".) The company physicians, when they examined White, also had found him disabled at the inception of the disability.
It should further be remarked that defendant's personnel manager admitted that a personnel check showed that White had not followed any gainful employment since the time of the injury, which is corroborated by all the lay testimony.
We think our learned brother below fell into error, under the facts of this case, in the importance which he attached to plaintiff's not proving the correct or exact date of the accident, both as needed to satisfy plaintiff's burden of proving by a preponderance of the evidence that the accident had occurred and as reflecting upon his credibility.
Because of the importance attached to this discrepancy, we will set forth in full the initial reports to his employer by plaintiff of the accident. On January 26, 1954, having according to his testimony (corroborated somewhat by co-employees) found that he could no longer perform the heavier inside work to which he had been retransferred from guard duty, he reported to the company physician, a Dr. Martinez. This physician's initial report on January 26, 1954 of the accident sets forth:
"* * * About 2 months ago he [White] `believes after mid-nite' patient working on big winder and pulled shaft, [in the machine room] slipped and fell back on `square outfit made of steel that plugs are in' and then fell sideways and struck left hip on cement floor. "Dont remember either month or week or day or time of injury."

"Made no report.
"First stated he didn't think it would amount to anything and later stated that he thought he had busted a rib on the right side." * * * (Italics ours.)
White was referred by the company physicians to Dr. T. E. Banks, an orthopedic specialist, who examined him on February 3, 1954, and diagnosed a possible ruptured disc. It is to be noted that at this examination White gave the same history of the accident and chronological sequence of his duties as he has consistently thereafter; that while pulling backwards on a shaft in the machine room, he fell back, striking and twisting his body; that, in Dr. Banks' summary of the history given to him by White, then "he had pain in the left hip and leg and was placed on light duty which he stated was guard duty for about six weeks. When he went back to heavy work the sprain recurred in more severe intensity in the left hip and thigh."' (Tr-166).
Subsequently, defendant's personnel manager took a written statement from White, investigated the circumstances of the accident *623 with co-employees (Tr-204-205), and placed White on weekly compensation at a rate of $30 per week, commencing January 25, 1954, which payments were not terminated until April 7, 1955 (or 65 weeks later).[1] The statement taken by defendant's personnel manager on February 12, 1954, is, in full:
"* * * My name is Tommy White. I was working for Calcasieu Paper Co. at Elizabeth, La. in the machine room. I was hired in January, 1953 in the finishing room, and then asked for and received a transfer to the machine room. I can't remember the date but I know it was about two months ago on graveyard shift I was pulling on a shaft and the lever slipped out and I fell backward and hit the steel plug trough and it throwed me sideways on the concrete. I hit the trough with my right side and fell sideways on my left side to the concrete floor. I got up and kept working. Grady Johnson asked me if I was hurt and I said I didn't think so only I got hit in the side and kinda knocked the wind out of me. In about three weeks I noticed a hurting in left hip and left leg. I then commenced to try to get out of the machine room. I then talked to Reeves Thompson who was in charge of the guards and asked him if he needed anybody else and he said yes and if I could get a transfer he would like to get me. I went to see Mr. Harper and he told me it was OK and then Reeves came in the machine room and got me. I worked as a guard until January this year and then Reeves sent me back in the mill and I went to the finishing room and I worked there until I had to go to the doctor and I haven't worked any since.
"/s/ Tommy White" (Italics ours.)
Plaintiff, a 270-lb. common laborer, 37 years of age, illiterate, had been employed at hard manual labor during his entire life. In January of 1953 he was employed by defendant, passing his pre-employment physical. He worked first in the finishing room, then was transferred to the "machine room" where the alleged accident occurred; worked two or three weeks after the accident under (he says) increasing pain and was transferred to the lighter guard duty on September 11, 1953; worked at this lighter guard duty until December 20, 1953, when he was retransferred back to the heavier and less paying work inside the plant because he was caught sleeping at his post for approximately the third time; was off about two weeks waiting to get back to work, hoping to get assigned back to guard duty; returned to hard work inside the plant approximately January 15, 1954, worked approximately nine days when (according to him) he could take the work no longer, due to the condition in his hip and leg which he had first noticed as a result of the accident back when he was employed in the "machine room". He then reported to the company physician on January 26, 1954.
Plaintiff's testimony of the accidental slipping in the machine room, his subsequent transfer to the lighter guard duty, and then his short return to heavier work immediately preceding his report of the injury to the company physician, are corroborated by his co-workers at the time of the accident, Homer James, William Grady Johnson, and Billy Guy Johnson, and is not contradicted or denied by defendant or defendant's witnesses. In the initial hearing, these co-employees estimated that the accident had happened in December, 1953.[2]
*624 Of course, it is impossible that plaintiff White sustained the accident in the machine room in December, 1953, because he had been transferred to guard duty from the machine room on September 11, 1953, as the company records show and as, in fact, White does not deny. It is of course apparent that White was mistaken as to the time succeeding the injury that he had worked on guard duty; not only did he tell Dr. Banks soon after the injury that he had been on guard duty only about six weeks, but even at the trial two years later he testified and reiterated under oath that succeeding the injury he worked on guard duty "about two months". (Tr-216.)
Of course, it is proven unquestionably that White worked on guard duty about 3 ½ months rather than the shorter period. But this testimony does not cast any more doubt on the fact that White actually worked 3 ½ months (rather than 6 weeks or 2 months) on guard duty, or indicate any intentional misstatement by White; than, in our opinion, does White's testimony, based on this mistaken estimate of the length of the intervening guard service, that the accident occurred in December rather than August cast doubt upon his corroborated testimony that the accident in the course of his employment with defendant had indeed taken place, or upon his intended veracity in so testifying.
Likewise, we are unable to attach the importance that able counsel for defendant-appellee earnestly urges should be placed upon White's failure to inform the examining physician at the time of his employment by defendant, or at least two of the subsequent examining physicians, of a prior compensation claim.[3] Although not commendable, these misstatements were not given under oath, and do not necessarily reflect upon White's credibility as a sworn witness in court, even if regarded as material deceptions in view of the minor nature of the previous compensation claims. But more important, Dr. Banks (who testified White had not truthfully informed him of these prior industrial accidents) found White disabled at the time of his examination by objective symptoms; and Dr. Pollard, informed during his deposition of this withholding of information by White at the time of the medical examination, testified that it did not change his diagnosis of disability.
*625 The company officials testified that White had asked for transfer from the machine room to the lighter guard duty because the concrete caused his feet to hurt, not because of pain from a prior injury. In rebuttal, White testified that they may have misunderstood his complaints which were that the machine room work made his leg and hip hurt (which the medical testimony indicates is a natural result of the disc injury). If this be regarded as a serious discrepancy, we do not regard it as so weighty as to overcome the uncontradicted testimony of an accident corroborated so strongly by surrounding circumstances. The phenomena of the employee, sustaining what initially seems to be a slight injury, endeavoring to continue on in his employment despite increasing pain in order to earn a living for himself and his family, is not unusual in our jurisprudence. Wallace v. Remington Rand, Inc., 229 La. 651, 86 So.2d 522; Bigham v. Swift & Co., 229 La. 341, 86 So. 2d 59; Johnson v. Cabot Carbon Co., 227 La. 941, 81 So.2d 2; Mottet v. Libbey-Owens-Ford Glass Co., 220 La. 653, 57 So.2d 218.
We believe the learned trial court, unintentionally but in effect, placed a burden upon the employee of proving that his disability did not result from an accident outside of the course of his employment. The employee's uncontradicted testimony of the accident at work is strongly corroborated by surrounding circumstances and the testimony of his co-workers. We are required to reverse this finding that no compensable accident had occurred. Fee v. Calcasieu Paper Co., La.App. 1 Cir., 89 So.2d 434; Turner v. Southern Industries Co., La.App. 1 Cir., 88 So.2d 238, certiorari denied; Hebert v. Hartford Acc. & Indemnity Co., La.App. 1 Cir., 88 So.2d 243; Bailey v. Long-Bell Lumber Co., La. App. 1 Cir., 63 So.2d 452, certiorari denied.
Plaintiff's wages in the machine room were $1.12 per hour. Based upon a six-day week, Carrington v. Consolidated Underwriters, 230 La. 939, 89 So.2d 399, sixty-five per cent of these wages exceeds the then-applicable maximum weekly compensation rate of $30.
Since plaintiff's wages subsequent to the accident and during the five months before the disability became legally manifest were paid at a different rate and for a different type of work (except for two or three weeks), and were fully earned and not paid pursuant to an express or implied agreement that such wage payments were to be received in lieu of compensation, defendant is entitled to no credit for same. Wallace v. Remington Rand, Inc., 229 La. 651, 86 So.2d 522; Mottet v. Libbey-Owens-Ford Glass Co., 220 La. 653, 57 So.2d 218; Myers v. Jahncke Service, Inc., La. App. Orleans, 76 So.2d 436. The Wallace and Mottet cases indicate that in such instances the date that compensation liability commences is the date the disability becomes legally manifest, that is, when the employee is no longer able to perform his duties and his employment terminates; in the present instance, January 25, 1954. Defendant is of course entitled to credit for the weekly compensation payments made by it to White from January 25, 1954 until April 17, 1955.
Plaintiff-appellant's request that the fees of Dr. Pollard and Dr. Sutton as expert witnesses be increased to $50 and to $35 (see Tr-198), should be granted. Fee v. Calcasieu Paper Co., La.App. 1 Cir., 89 So.2d 434.
For the above and foregoing reasons, the judgment of the District Court dismissing plaintiff's suit is reversed; and judgment is rendered herein in favor of plaintiff, Tommie White, and against defendant, the Calcasieu Paper Company, Inc., for compensation at the rate of $30 per week during disability, not to exceed 400 weeks in all, commencing January 25, *626 1954, subject to credit for compensation heretofore paid, together with legal interest on all compensation installments from date of delinquency until paid, and for all costs of these proceedings. The fees of the medical experts testifying are as fixed by the District Court, except that the fee of Dr. Pollard is increased to $50 and that of Dr. Sutton to $35. It is further ordered that the fee of Wood and Jackson, attorneys at law, is hereby approved and fixed in the amount of 20% of the amounts collected under this judgment, not to exceed $1,000 in all.
Reversed and rendered.
NOTES
[1] Compensation was not discontinued a year later on any ground that no accident had occurred; it was because plaintiff, feeling he could not perform the duties, refused to return to light work as tentatively recommended by Dr. Banks.
[2] Cf., testimony of Homer James, Tr-262-3:

"Q. Were you working with Mr. White during the month of December, 1953? A. Yeh, I guess I teas. It was in the winter time when he got transferred over to the machine room, I believe.
"Q. "Do you remember whether you were working with him on or about December 10, 1953? A. Yeh, I guess I was. I didn't notice the calendar. Didn't keep up with that.
"Q. Were you working with him when he had an accident? A. Yeh, I was working with him when he fell.
"Q. Did you ever see him have more than one accident while you were working with him? A. That's the onliest time I ever saw.
"Q. And that was on or about December 10, 1953? A. Yeh, it was about then. Now, I'm not saying it was then because I don't remember if it was in Decemberthe 10th of December or not."
Cf. also testimony of William G. Johnson, e. g.,
"Q. Do you remember if you were working with Mr. White here on or about the 10th or middle part of December in 1953? A. Well, somewhere along in through there I worked. (Tr-254.) * * *
Well, it was somewhere through that month when we were working together" (that is, that White got hurt).
White and Johnson worked together in the machine room, until White was transferred to the lighter guard duty; Johnson remained in the machine room.
[3] This prior injury had occurred on May 2, 1949, almost four years before his employment by defendant, and had been settled for $200. Plaintiff had been continuously employed in hard manual labor since that time, without complaint of back injury until the present accident. (Several years before that he had drawn about $60 compensation over two or three weeks for a cut ear.)